IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,542

In the Matter of RICKEY EDWARD HODGE, JR.,
*Respondent*.

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed December 29, 2017. Disbarment.

*Deborah L. Hughes*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the brief for petitioner.

*Charles Davant IV*, of Williams & Connolly LLP, of Washington, D.C., argued the cause, and *John K. Villa*, of the same firm, and *G. Craig Robinson*, of Wichita, were with him on the briefs for respondent. *Rickey Edward Hodge, Jr.*, respondent, argued the cause pro-se.

PER CURIAM: This is a contested attorney discipline proceeding against Rickey Edward Hodge, Jr., who was admitted to practice law in Kansas in September 2008. A panel of the Kansas Board for Discipline of Attorneys made lengthy findings of fact and concluded Hodge violated the Kansas Rules of Professional Conduct (KRPC) while representing a financially distressed Wichita-based landscaping company. Highly summarized, Hodge attempted to purchase the company's assets, as well as an 80-acre ranch held by the company's majority shareholder. The accusations involve conflict of interest, client exploitation, and self-dealing.

After five days of hearings, spread out between October 2015 and March 2016, the panel unanimously determined that Hodge violated KRPC 1.7 (2017 Kan. S. Ct. R. 300) (concurrent conflict of interest); 1.8(a) (2017 Kan. S. Ct. R. 307) (conflict of interest

1

arising from entering business transaction with client), and 1.8(b) (using information to the client's disadvantage); 4.2 (2017 Kan. S. Ct. R. 353) (communication with person represented by counsel); and 8.4(g) (2017 Kan. S. Ct. R. 379) (engaging in conduct adversely reflecting on lawyer's fitness to practice law). The panel unanimously recommended Hodge be disbarred.

Before this court, the Disciplinary Administrator's office endorses the panel's findings and recommends disbarment. Hodge takes exceptions to the panel's findings, as well as to the recommended discipline. We hold that clear and convincing evidence establishes multiple instances of attorney misconduct and agree disbarment is appropriate.

PROCEDURAL BACKGROUND

On July 15, 2014, the Disciplinary Administrator's office filed a formal complaint against Hodge. On August 15, 2014, Hodge filed an answer to the formal complaint, admitting many factual allegations while denying the alleged KRPC violations.

The panel conducted hearings on October 20, 2015, December 7, 2015, December 8, 2015, March 3, 2016, and March 4, 2016. Hodge appeared in person and with counsel. After the hearings concluded, the panel issued a 65-page Final Hearing Report, making the following findings of fact and conclusions of law, together with its recommendation for discipline:

. . . .

"11.     In addition to practicing law, the respondent owns and operates a number of businesses, including Hodge Acquisitions, L.C. Hodge Acquisitions holds various commercial, residential, and agricultural real properties for lease or for sale.

"12.     Complete Landscaping Systems, Inc., (CLS) a Wichita based landscaping company was owned by P.S. L.A. came to work for P.S. at CLS. In October, 2010, P.S. married L.A. Later, P.S. and L.A. divorced. Following their divorce, majority ownership of CLS was transferred to L.A. L.A. owned a 99% interest in CLS and P.S. retained a 1% interest in CLS following the divorce. Additionally, P.S. was to receive additional financial benefits under the transfer agreement between L.A. and P.S.

"13.     For a period of time in 2006 and 2007 and then again beginning in 2011, Trinidad Galdean, a Wichita lawyer, served as outside general counsel for CLS.

"14.     In 2009, during their marriage, P.S. and L.A. purchased an 80-acre ranch for $2.25 million from the Michaud Family Trust. The Michaud Family Trust held the mortgage on the property. P.S. and L.A. made a substantial down payment and substantial monthly payments toward the purchase of the property. After P.S. and L.A. divorced, L.A. remained in the ranch.

"15.     CLS developed financial difficulties. CLS faced lawsuits in several states including Arkansas, Florida, Kansas, Michigan, Missouri, New Jersey, Oklahoma, Pennsylvania, Texas, and Virginia. Also, L.A. developed personal financial difficulties. L.A. became past due on the ranch in excess of $100,000. In July, 2013, L.A. owed approximately $563,000 on the mortgage.

"16.     On November 20, 2012, a judgment was entered against CLS in Texas in *Hadden vs. CLS*. Later, on May 1, 2013, L.A. was served with an order to appear in aid

3

of execution of judgment on the *Hadden* judgment, Sedgwick County case number 13CV0586. The Sedgwick County case was an attempt to enforce the Texas judgment.

"17. On May 15, 2013, Mr. Galdean referred CLS to the respondent for representation in the *Hadden* collection litigation to attempt to mitigate the liability through a workout, a settlement, or some other form of negotiation. On May 17, 2013, L.A. met with the respondent at his office regarding the *Hadden* collection litigation.

"18. At the hearing on this matter, the respondent initially testified that he never entered his appearance on behalf of CLS in the *Hadden* collection litigation. However, beginning on May 24, 2013, and continuing through July 26, 2013, the respondent's electronic signature block appears on many agreed orders in the *Hadden* collection litigation. Clearly, by approving the agreed orders, the respondent entered his appearance. The hearing panel finds that beginning May 24, 2013, the respondent was the attorney of record for CLS in the *Hadden* collection litigation. The respondent never withdrew from the representation.

"19. On June 7, 2013, L.A. entered into a written fee agreement with the respondent and paid the respondent $2,500 retainer for representation in the *Hadden* collection litigation.

"20. On June 11, 2013, the respondent and L.A. met in the respondent's office to discuss CLS' collection matters.

"21. In the course of representing CLS in the *Hadden* collection litigation, the respondent discovered that CLS was in serious financial difficulty. The respondent learned that CLS owed money to many subcontractors and vendors for landscape products. The respondent learned that one of CLS' largest clients stopped paying CLS due to a dispute. The respondent learned that CLS lost several other clients to competitors. The respondent came to understand that CLS did not have the capital to pay its debts. The respondent learned that CLS had litigation pending in many jurisdictions and that CLS had a number of judgments previously entered against it which remained unpaid.

4

"22.    The respondent also learned that L.A. was several months behind on payments on the mortgage on the ranch. At that time, L.A. had a past due balance on the ranch mortgage in the amount of approximately $113,000-$120,000.

"23.    On June 25, 2013, the respondent and L.A. met regarding the financial viability of CLS. L.A. was opposed to filing a chapter 7 bankruptcy. The respondent advised against filing a chapter 11 reorganization bankruptcy case because 'the lack of monthly operating revenue would likely prohibit the successfully reorganization.' The respondent told L.A. that sale of the company was unlikely because of the 'substantial tax liabilities and other mounting debts.' The respondent told L.A. that her last option was an asset sale.

"24.    Previously, in the summer of 2011, the respondent and another individual started a lawn care business called Yard Concerns. On July 17, 2011, the respondent registered a website, yardconcerns.com. Yard Concerns was formed to grow the small customer base into a steady yard service and sod company. The client base did not mature, the business did not grow, and the other individual gained other employment.

"25.    On July 16, 2013, beginning at 9:51 a.m., the following exchange took place between the respondent and L.A. *via* text messages:

'R.    Are you free to talk in about an hour?

'L.A.    I'm in KC working today. Tomorrow????

'R.    Ok. I talked to Trinidad this morning and need to call him at 2 pm today. How is your cash situation right now?

'L.A.    I should have the 70K any day. Nothing at the moment. Made it through payroll yesterday :) I also made the building loan payment.

5

'R.     According to Trinidad there is approximately 20K per month due on the existing 5 settlements and the total debt is about 100K. We will need to sell the national portion of complete ASAP. I'm going to put together some paperwork and we can talk about this. As for the local operations, I have a prospective friendly buyer for that segment. We will need to address staff/tax issues and start getting you a pay check.

'L.A.    . . . Hadden garnished commerce—got 400.00

'R.     I know. I have a call into Carl Davis about a prospective agreement. . . .

'L.A.    . . . Can you say who the potential buyer is?

'R.     Yes. The prospective buyer's name is Rick Hodge and he is a super nice guy. :)

'L.A.    I'm speechless! That's not normal. I owe you my life. Just blinded you on an email to Trinidad.

'R.     Ok. We need to meet and talk about how we may structure this. No obligation, but I got to thinking about something that may solve several problems.'

"26.    Throughout the respondent's testimony, as well as in his initial response to the complaint and his answer, the respondent insisted that he was not personally involved in the transactions, rather the companies that he (solely) owns were involved. Specifically, the respondent stated and testified that Yard Concerns attempted to purchase CLS' assets and Hodge Acquisitions purchased the ranch, not Rick E. Hodge, Jr., attorney at law. Despite this, the respondent also testified that his 'name is synonymous with [his] businesses.' Because the companies have no owners other than the respondent, the companies are simply extensions of him. Considering all the evidence together, the

6

hearing panel finds that the respondent's statements that the actions taken were not taken by him but rather by his companies are an attempt to obfuscate the issues at hand.

"27. By July 10, 2013, L.A. believed that the respondent was her attorney as to CLS matters as well as her attorney regarding her problems with paying the mortgage on the ranch.

"28. Cameron Michaud, attorney for the Michaud family trust which held the mortgage on the ranch, scheduled a meeting with L.A., in Ms. Michaud's office on July 18, 2013. L.A. asked the respondent to attend the meeting with her. The respondent agreed to attend the meeting. At the meeting, L.A. introduced the respondent as an attorney. During the meeting, the respondent informed Ms. Michaud that a third party was interested in purchasing the ranch and that the third party was willing to lease the ranch back to L.A. L.A. pulled Ms. Michaud aside and told her that the respondent was the third party interested in purchasing the ranch. Later that day, the respondent sent Ms. Michaud an email message which provided, 'Fantastic meeting you. I hope that I can facilitate a quick resolution if at all possible.'

"29. Because L.A. expressed interest in selling CLS' assets to the respondent, on July 23, 2013, the respondent filed documents and formed Yard Concerns, L.C., as a limited liability company.

"30. Throughout July 2013, litigation and financial troubles, including tax deficiencies, mounted for L.A. and CLS.

"31. On July 29, 2013, the respondent met with L.A. Following the meeting, the respondent sent the following email message to L.A.:

'I wanted to clarify our conversation earlier today. It is my understanding that you believe Complete Landscaping Systems, Inc. does not, and will not, have sufficient operating funds to meet its ongoing operational obligations such as payroll, tax and mortgage expense. Moreover, you expressed that Complete Landscaping Systems,

7

Inc. does not, and will not, have sufficient resources to meet its existing contractual obligations owed to clients and other states, nor will it have sufficient resources to meet the obligations owed to subcontractors for these contracts. Lastly, you expressed concern that Complete Landscaping Systems, Inc. does not have sufficient resources to continue ongoing litigation in Kansas, and in other jurisdictions, in addition to remitting payment for legal fees incurred by this office and Hinkle Law.

'For this reason you have requested that this office discontinue legal representation of Complete Landscaping Systems, Inc. and any parties thereto related. Please understand that if you no longer have representation in Kansas, or any other jurisdiction, you will not have anyone to litigate the claims brought against you and Complete will likely face default judgment. If this happens then the assets of Complete Landscaping Systems, Inc. may be levied to satisfy obligations owed to creditors. This will put Complete out of business.

'I also understand that you do not wish to further explore any form of bankruptcy reorganization or liquidation at this time, however, you have requested that I make contact with a prospective party that may have interest in purchasing part or all of Complete Landscaping Systems, Inc., or its assets. As stated earlier, I am a member of the organization that may be interested in purchasing part or all of Complete Landscaping Systems, Inc. or its assets. Any negotiations entered into by this organization and Complete must be at arm's length. In no way can I represent Complete Landscaping Systems, Inc. or any party affiliated with that organization because of potential future conflicts. Complete Landscaping Systems, Inc., would also be required to sign a Waiver of Conflict of Interest because Rick Hodge, Attorney At Law, L.C. represents the prospective buyer who would entertain purchasing Complete Landscaping Systems, Inc. or its assets. Although this potential purchase transaction does not directly correlate with the matter at hand, it

8

touches on the financial matters of Complete to which I have some knowledge.

'Please reply to my email stating that you do or do not wish for my office to disengage in representation of Complete and any of its matters. Also, please reply that you do or do not wish to discuss the possibility of a third-party negotiation for the purchase of some or all of Complete or its assets.'

That same day, at 2:44 p.m., L.A. sent the respondent an email which provided, 'Please disengage as legal representation for CLS. Please assist with the third-party negations [*sic*] as discussed earlier.' Four minutes later, at 2:48 p.m., L.A. sent the respondent a text message asking him if her email response was good enough.

"32.    On July 30, 2013, in the early afternoon, L.A. questioned the respondent as to whether he wanted her to participate in a conference call with Mr. Galdean and Mr. Hubbard regarding certain litigation. The respondent confirmed that L.A. should participate in the conference call. L.A. did participate in the conference call and during [the] conference call with Mr. Galdean regarding pending litigation, L.A. communicated privately with the respondent, *via* text messages. In those private communications, L.A. indicated that she was concerned about a case where she was named personally. The respondent advised L.A. that a certain case needed to be continued. That same day, the respondent told L.A. that he did not want her to string out litigation if she could not afford it. Although the respondent acknowledged that he could not give L.A. advice, L.A. immediately asked for advice and the respondent provided it.

"33.    On July 31, 2013, L.A. asked the respondent if they wanted to settle a specific case. The respondent advised L.A. that certain action would stay the execution of judgment and buy some time.

"34.    On August 2, 2013, a hearing on the creditor's order in aid of execution in the *Hadden* collection litigation was held. L.A. did not appear. Following the hearing, the respondent informed L.A. that the hearing would be reset and that he needed her to

9

provide him with documents that Carl Davis, opposing counsel, requested. Additionally, the respondent asked L.A. whether she received his electronic mail message about a settlement.

"35.    On August 4, 2013, P.S. emailed a letter to L.A. In the letter, P.S. stated:

'It seems that you have three options that may be favorable to you . . .

'The third options, [*sic*] and in my opinion, the most viable one is for you to sell the house in Derby and with the proceeds you can buy yourself and your father a nice home and the rest you can use to pay bills. You have equity of about 1.5 million dollars; the equity comes from the loans you have made to yourself from Complete Landscaping. . .

"36.    On August 5, 2013, Mr. Galdean sent an email message to L.A., the respondent, and others, which provided:

'During the last discussion between, [*sic*] Paul, Rick and me, Rick Hodge was handling the discovery responses and deposition issues for Complete Landscaping and [L.A.] I have not received any updates on the discovery issues or depositions other than I was told by [L.A.], on July 25, that Rick was handling the issues. Rick should have the information.'

Later that day, L.A. sent an email message to Mr. Galdean, the respondent, and others, which provided, 'As stated in recent correspondence, Rick Hodge is not representing CLS as council [*sic*] regarding legal issues. With that said, [P.S.] what do you need me to do?'

"37.    In order for the asset sale to move forward, L.A. needed P.S. to sell his remaining interest and dissolve or waive the non-compete agreement. On August 12, 2013, L.A. contacted the Foulston firm in Wichita, Kansas, to assist her with buying out P.S.' ownership interest and dissolving the existing non-compete he had as part of the original sale of the business to L.A. On August 13, 2013, an attorney from the Foulston firm sent L.A. an electronic mail message requesting documents and asking for

10

information necessary to complete the work. L.A. immediately forwarded the electronic mail message to the respondent and asked him whether he had the information readily available.

"38.    On August 14, 2013, Ms. Michaud sent an electronic mail message to the respondent regarding the calculations for late fees on the ranch property. In addition to listing the late fees, Ms. Michaud stated:

'[L.A.] asked that I cc: her on emails I send to you regarding payments. I am not sure of your relationship (attorney/client). I will send this to her, along with the payout spreadsheet, later this afternoon unless I hear from you otherwise.'

"39.    On August 15, 2013, L.A. named the respondent the resident agent of CLS.

"40.    On August 16, 2013, an attorney with the Foulston firm sent L.A. an electronic mail message asking whether L.A. or CLS was the purchaser. L.A. again forwarded the electronic mail message to the respondent and asked him whether he had the answer to the question.

"41.    Again, on August 19, 2013, an attorney with the Foulston firm sent L.A. an electronic mail message asking whether L.A. or CLS was the purchaser. Additionally, the attorney requested a number of documents. L.A. asked the respondent to 'ghost' a reply to the attorney.

"42.    Later, on August 19, 2013, L.A. informed the respondent that she received an unexpected $26,000 and sought the respondent's advice regarding the income.

"43.    On August 19, 2013, Mr. Galdean sent an email message to L.A., the respondent, and another, which provided as follows:

11

'Attached is the recent lawsuit received today in Maddox Irrigation, Inc. It appears service was requested the same day your other legal counsel, Rick Hodge, was designated as the Company's Resident Agent. Thus, Rick is being copied on this email.

'In regards [*sic*] to this lawsuit, neither I nor my firm is representing Complete Landscaping Systems, Inc. Thus, it is necessary that Complete Landscaping Systems secure other legal counsel to represent it in the lawsuit.

'Any answer to the lawsuit must be filed before September 9, 2013; otherwise a default judgment may be taken in the lawsuit against Complete Landscaping Systems, Inc.'

In response, L.A. sent an email message to Mr. Galdean, Ms. Calisti, and the respondent as follows, '[l]et's just clarify for the umpteenth time, Mr. Hodge is not my legal representation [*sic*]. His firm is merely accepting the incoming cases as "Agent".'

"44.    On August 20, 2013, L.A. and Hodge Acquisitions entered into a purchase agreement regarding the ranch. The respondent agreed to purchase the ranch for $570,000.00.

"45.    L.A. testified that they agreed that the equity in the residential property would secure his risk of loss in the purchase of the business. L.A. testified that the respondent assured her that she could remain in the ranch, that he would hire her at the lawn maintenance company at a salary which would permit her to make lease payments on the ranch, and the lease payments on the ranch would be credited toward her repurchase of the ranch.

"46.    At the hearing on this matter, the respondent testified that L.A. was always able to repurchase the ranch for the purchase price, but that the rents collected would serve as his profit. The respondent testified that the rents were not to be counted toward the re-purchase price.

12

"47. The hearing panel observed the witnesses testify at the hearing. Based upon the hearing panel's observations of all the witnesses at the hearing as well as the exhibits admitted into evidence, the hearing panel accepts L.A.'s testimony on this point and finds that the respondent's testimony in this regard lacks credibility.

"48. The day after signing the original purchase agreement regarding the ranch, on August 21, 2013, Yard Concerns made a formal offer for the purchase of assets owned by CLS. Yard Concerns offered to purchase:

'1. All furniture, fixtures, equipment, software, vendor lists, contractor lists, rights to trade secrets, supplies, and vehicles;

'2. All commercial and residential contracts now existing and currently renewing; and

'3. All commercial and residential account receivables accrued from January 1, 2013, to current.'

Yard Concerns also agreed:

'. . . to remit $200,000.00 to be paid over 60 months at a rate of interest of 5.00%, for a total monthly payment of $3,774.25, commencing October 1, 2013. Yard Concerns, L.C. reserves the right to prepay the entire purchase price in full at its discretion and at any time prior to the expiration of the 60 month term; and'

And, Yard Concerns agreed to:

'. . . assume secured debt CLS owes to RMI, Inc. in the amount of $118,273.10, subject to all RMI's approval of the transfer of ownership of its collateral and CLS' debt.'

13

The respondent made the offer expressly conditioned upon:

'1.	Written acceptance of this offer by the board of directors and all shareholders of CLS;

'2.	The dissolution of any existing non-compete agreements entered into by all shareholders, managers, operations personnel, and persons with ability to limit the sale of assets, employment of any and all existing CLS personnel, and transition of accounts to Yard Concerns, L.C.;

'3.	Yard Concerns, L.C. will relocate management to its corporate offices, however, in an effort to not disrupt commercial and residential services until the end of the operating season, Yard Concerns, L.C. is granted the option to rent CLS's building on a month-to-month basis at the rate of $1,800.00 per month until Yard Concerns, L.C. is able to relocate all acquired assets to its facility;

'4.	Full and complete cooperation from CLS shareholders, CLS management, CLS staff, and controllers of third-party contracts to effectuate a smooth and undisturbed of [*sic*] transition of assets and operations;

'5.	Written waiver of conflict of interest with Rick Hodge, Attorney At Law, L.C., considering it is counsel for Yard Concerns, L.C. and its parent company, and CLS engaged Rick Hodge, Attorney At Law, L.C. to represent CLS in one limited matter in Sedgwick County District Court and to serve as Registered Agent for CLS;

'6.	The execution of a non-disclosure and a non-compete agreement by each officer and shareholder of CLS for the benefit of Yard Concerns, L.C.;

14

'7.     Re-application of all staff to Yard Concerns, L.C. period for employment;

'8.     General warranty to Yard Concerns, L.C. of complete and unfettered transferability of assets being purchased, and indemnification by CLS and its shareholders as to the same;

'9.     The express understanding that this is an asset sale and not an agreement to purchase CLS stock; and

'10.     The express understanding that the real property assets of CLS are not being purchased by Yard Concerns, L.C.'

Following the recitation of conditions, the respondent's offer provided as follows:

'Please advise within two (2) business days of the date of this letter of CLS' acceptance or rejection of this offer. If the same is accepted, please feel free to have your legal counsel draft the sale and asset transfer documents. Should you prefer, Yard Concerns, L.C. will do the same and submit the documents to you and your legal counsel for review and execution. If this offer is not accepted as of 5:00 p.m. on Friday, August 23, 2013, the same will be deemed rejected.'

The respondent was aware of L.A.'s dire financial situation and knew that L.A. would be unable to secure counsel and have counsel review the agreement within two days.

"49.     That same day, on August 21, 2013, the respondent offered to L.A. to draft the dissolution of the non-compete needed from P.S. L.A. accepted the respondent's offer to draft the dissolution.

"50.     P.S. agreed to meet with L.A. regarding CLS matters, on August 22, 2013, at 1:30 p.m. The morning of the scheduled meeting, L.A. asked the respondent whether he would be able to provide a dissolution of the non-compete before 1:30 p.m.

15

that day, in time for the meeting. The respondent agreed. At 1:56 p.m. that afternoon, the respondent forwarded the following to L.A. *via* electronic mail:

'COMPLETE LANDSCAPING SYSTEMS, INC.

'<u>MINUTES OF A SPECIAL MEETING OF THE BOARD OF DIRECTORS AND SHAREHOLDERS</u>

'A special meeting of the Board of Directors and Shareholders of Complete Landscaping Systems, Inc. was held on August 22, 2013, at 1:30 p.m. at 1727 E. Second Street, Wichita, KS, pursuant to written Waiver of Notice fixing the time and place of said meeting, signed by all of the Directors and Shareholders, as follows:

'<u>WAIVER OF NOTICE</u>

'We, the undersigned, being all of the members of the Board of Directors and Shareholders of Complete Landscaping Systems, Inc., do hereby waive notice of the time, place, and purpose of a special meeting of the Board of Directors and Shareholders and do hereby fix the 22nd day of August, 2013, at 1:30 p.m., as the time, and 1727 E. Second Street, Wichita, KS as the place for the holding of said meeting, for the purpose of considering the advisability of a dissolution of the mutual covenants not to compete, executed by the parties hereto, the partial sale of assets of Complete Landscaping Systems, Inc., to Yard Concerns, L.C., pursuant to its offer dated August 21, 2013, waiver of conflict of interest for Rick Hodge, Attorney At Law, L.C., and transacting other business that may properly come before said meeting.

'Each of us hereby waives all of the requirements of the statutes of Kansas and the By-Laws of this corporation as to notice of said meeting and formalities for the Board of Directors and Shareholders, and

16

hereby consents to the transaction of any and all business which may lawfully come before said meeting.

'IN WITNESS WHEREOF, We have hereunto set our hands this 22nd day of August 2013.

_____
'[L.A.]

_____
'[P.S.]

'The meeting was called to order by [L.A.], President. Upon roll call, it was ascertained that [L.A.] and [P.S.] were present and the same constituted a quorum.

'Thereupon, the Chairman stated that the meeting was duly organized and ready for the transaction of business and that the first order of business was to consider the advisability of accepting the offer to purchase partial assets of Complete Landscaping Systems, Inc., made on August 21, 2013 by Yard Concerns, L.C., and the second order of business was to consider the advisability of the dissolution of the non-compete agreement entered into by [P.S.] and [L.A.] for their mutual benefit and that of Complete Landscaping Systems, Inc., and that the third order of business was to consider the waiver of conflict for Rick Hodge, Attorney At Law, L.C.

'The offer to purchase partial assets made by Yard Concerns, L.C., was submitted to the Board of Directors and Shareholders for their examination. The dissolution and termination of the non-complete agreement entered into for the mutual benefit of [P.S.], [L.A.], and Complete Landscaping Systems, Inc., was brought before the Board of Directors and Shareholders for discussion. The execution of Waiver of

17

Conflict of Interest for Rick Hodge, Attorney At Law, L.C., was brought before the Board of Directors and Shareholders for discussion. After discussion, the following resolution was introduced:

"'BE IT RESOLVED, that the Board of Directors and Shareholders of Complete Landscaping Systems, Inc., hereby declare it to be advisable to ACCEPT the offer made on August 21, 2013, by Yard Concerns, L.C., for the purchase of partial assets of Complete Landscaping Systems, Inc., that the offer made by Yard Concerns, L.C., on August 21, 2013, be fully incorporated by reference herein and the terms therein be fully and completely agreed to, and that the President of Complete Landscaping Systems, Inc., be authorized to execute all transfer and sale documents required for the consummation of the transaction with Yard Concerns, L.C.; and

"'BE IT FURTHER RESOLVED, that the non-complete [*sic*] agreement executed by [P.S.] and [L.A.] for their mutual benefit, and that of Complete Landscaping Systems, Inc., is hereby terminated, canceled, and held for naught; and

"'BE IT FURTHER RESOLVED, that Complete Landscape Systems, Inc., hereby waives any and all conflict of interest with Rick Hodge, Attorney At Law, L.C. for its representation of Yard Concerns, L.C., the party offering to purchase assets, and Rick Hodge, Attorney At Law, L.C.'s prior or current transactions and representation of any sort or kind, whatsoever, involving Complete Landscaping Systems, Inc., in a matter in Sedgwick County District Court, and that the President of Complete Landscaping Systems, Inc., be authorized to execute all waiver documents to carry out this resolution."

'Upon motion duly made and seconded, said resolutions were unanimously adopted.

'There being no further business to come before the meeting, upon motion duly made, seconded and carried, the meeting was adjourned.

_____

'[L.A.], President

'Approved:

_____

'[P.S.], Chairman of the Board'

When the respondent sent the minutes and resolution, the respondent stated: '[y]ou are advised to seek legal counsel when this is discussed and before it is signed.' At the time the respondent sent the electronic mail message, he knew that L.A. and P.S. were meeting and were waiting on the documents and did not have time to seek and obtain independent legal counsel.

"51.     On August 22, 201[3], CLS, through L.A. and P.S., accepted Yard Concerns offer to purchase certain assets.

"52.     On August 29, 201[3], the respondent sent letters to CLS' existing clients informing them that Yard Concerns had acquired its account from CLS, using Yard Concerns' letterhead.

"53.     On September 3, 2013, the respondent sent a series of text messages to L.A., including:

'. . . FYI, I did tell the eagle that yard concerns purchased about 90% of cls accounts and local operations. Yc did not buy cls, just some Assets. I did not mention the pm side. We should keep that for another day. Told her yc did not buy the building either and that you would still own cls. Didn't say you were going to work for yc. She's going to call you.'

19

L.A. replied, 'She's going to roll with what you said. And do a follow up with me tomorrow. I don't want to talk to her unless you've coached me.'

"54.     On September 4, 2013, the Wichita Eagle published an article on Yard Concern's purchase of CLS' assets. The article was updated later that same day.

'Wichita attorney purchases most of
Complete Landscaping's local assets

'UPDATED – Almost all of Complete Landscaping Systems' local business has sold.

'"We have purchased 90 percent of their local operations," says Rick Hodge, a bankruptcy attorney.

'Hodge owns Yard Concerns, a company that until now has mainly existed to serve commercial and residential properties he owns.

'"Now we're going to try to grow it and branch out," Hodge says.

'During a slower season in a month or two, Hodge says he'll relocate equipment he purchased from Complete Landscaping to another building.

'"We are not Complete Landscaping by any means," he says. "Complete is still in existence."

Complete Landscaping owner [L.A.] didn't have an immediate comment.

'The company, which [L.A.] purchased in 2010, has had a series of financial and legal issues since then, much of them stemming from a

20

dispute with Bank of America, which once had been a large national account for the company.

"'I know that Complete has been having a lot of problems," Hodge says. "I knew they had some cash flow problems. . . . I'm fearful their entire ship is or was sinking."

'His career as a bankruptcy attorney influenced his decision to buy most of Complete Landscaping's local assets and accounts, he says.

"'I would hate to lose more jobs in the Wichita community," Hodge says.

'He says Complete Landscaping has some great workers who have been with the company for a long time.

"'We thought, well, this might be an opportunity to help out some of the employees," Hodge says. "Some of their key employees likely will be transitioning to us."

'It looks like Complete Landscaping will keep its headquarters at 1727 E. Second St., where Michael's Complete Lawn Care began sharing space earlier this year to save costs for both companies.

'[L.A.] says she will discuss changes at her company later this week.'

"55.    On September 4, 2013, the respondent informed L.A. that he had reached a tentative resolution with one of CLS' creditors. The respondent recommended to L.A. that she attempt to sell the building where CLS was operating. The respondent told L.A. that if all went well, 'this whole thing will blow over in a week or two and with minimal damage.'

"56.    Also on September 4, 2013, the respondent said to L.A. 'I wouldn't tell anyone a thing right now.' L.A. agreed.

21

"57.     That same evening, the respondent informed L.A. that he worked 'serious magic' with a creditor. The respondent told L.A. that he would help her with what to say, acknowledged that he knows she trusts him, and stated that he would help her get through this.

"58.     On September 4, 2013, the Wichita Business Journal published an article regarding sale of CLS' assets.

'Bankruptcy attorney Rick Hodge has purchased about 90 percent of the assets of Wichita's Complete Landscaping Systems, though Complete still exists.

'The Wichita Eagle reports Hodge owns Yard Concerns, a company that has mainly focused on serving the commercial and residential properties he owns, but he hopes to expand the business.

'Complete Landscaping's recent financial troubles played a role in Hodge's decision. The company was facing at least six lawsuits from businesses saying Complete owed them money. Complete CEO [L.A.] told the Wichita Business Journal the cash flow issues were the result of a dispute with what was previously a major client for Complete, Bank of America.

'Hodge said he wanted to try to protect some of the local jobs by purchasing Complete assets.

'For now, it appears Complete is continuing to operate at a building it shares with Michael's Complete Lawn Care.'

"59.     On September 6, 2013, the respondent informed L.A. that Carl Davis, expected L.A. to be at a hearing in the *Hadden* collection matter that day. L.A. told the respondent that she could not be at the hearing that day.

22

"60.     On September 10, 2013, Mark Lazzo, attorney for the bank holding the note on CLS' real property, sent a letter to CLS, P.S., and L.A., which provided:

'This office has been retained by Equity Bank ("Bank") regarding a default on the referenced loan (the "Loan") owed by Complete Landscaping Systems, Inc. ("CLS" or "Borrower") to the Bank. As you know, the Loan is personally guaranteed by you both (collectively "Guarantors") and secured by four (4) parcels of real estate owned by CLS located at 1717, 1725, and 1727 E. 2nd St. Wichita, Kansas, and 1728 E. Mildred, Wichita, Kansas, 67214 (the "Mortgaged Property") and rents generated by the property.

'In an article published in the Wichita Eagle late last week, the Bank learned, for the first time, that CLS sold all of its personal property assets to local attorney Rick Hodge. This fact has been confirmed by Mr. Hodge. In addition, the Bank learned from its own investigation that judgments exceeding $350,000 have been entered against CLS, and federal tax liens have been filed against the company's assets.

'Be advised that the above events constitute a default on the Loan, and the Bank is hereby declaring the Loan in default. The May 30, 2013 Promissory Note (the "Note") and March 30, 2010 Business Loan Agreement ("BLA") between the Bank, CLS and Guarantors expressly provides that a default on the Loan occurs if: (a) there is a wholesale transfer of the company's assets; (b) there is a material adverse change in the company's financial condition which materially impairs CLS' ability to perform on the Loan; (c) judgments are entered against CLS which materially affect its business; (d) there is a change in control of CLS's business; and/or (e) the Bank's [*sic*] holds a good faith belief that CLS will be unable to perform its Loan obligations. All of the above events have occurred.

23

'As of September 9, 2013, the approximate payoff on the Loan is as follows:

    a.       Principal balance – $292,046.81;

    b.       Accrued interest at contract rate of 10% per annum through September 9, 2013 – $812.85;

    c.       Interest at default rate of 18% per annum after September 9, 2013 – $144.02 per day until paid in full; and

    d.       Late fees – $446.16.

'Interest at the default rate and late charges continue to accrue. In addition, the above does not include contractual charges which have, or may, accrue under the agreements between you and the Bank including, but not limited to, costs of suit, title searches, appraisal fees and attorney fees and expenses incurred by the Bank.

'As you know, the Bank holds an assignment of rents from the Mortgaged Property. I understand that CLS is currently receiving rent payments from tenants Yard Concerns, L.C. and Michael's Complete Lawn Care. <u>These rent payments must be turned over to the Bank, as this is our collateral.</u>

'Unless you dispute the validity of the above debt or any portion thereof within thirty (30) days after receipt of this notice, the debt will be assumed to be valid by our firm. If you notify our office in writing within thirty (30) days after receipt of this notice that the debt or any portion thereof is disputed, we will obtain and provide you with verification of the debt by mail.

'The law does not require us to wait until the end of the thirty (30) day period before commencing an *in rem* foreclosure action on the Mortgaged Property or in [*sic*] *in personam* action against the obligors on the Loan—CLS and the Guarantors.

. . . .

'Please advise within ten (10) days of the date of this letter how you intend to satisfy the Loan balance. If you would like to discuss this matter, please do not hesitate to call.'

"61.     On September 11, 2013, the respondent sent L.A. an email message which provided:

'We are set to close on Friday at 3:30p at Security First downtown. We both know that Mrs. Michaud said she is going to foreclose on you if you don't sell it and pay her. I have a copy of the foreclosure title work that Morris Lang [*sic*] ordered to begin the process. You also said you need it sold so you can pay the taxes and get your auto tags. I also know you don't want to move. I understand all of this and wish it wasn't happening.

'I really think the world of you and I hope everything works out. I know we have talked about it before but I just want to make sure you really understand the risk here and make sure you really want to go through with the sale of you [*sic*] home? [*sic*] Because you are now married, [M.A.] will also have to sign the deed.'

Within 3 minutes, L.A. replied, '[M.A.] and I are aware of the risk. See you at closing—we will both be there.'

"62.     On September 11, 2013, in a text message conversation with L.A., after the respondent listed many potential issues with CLS' asset sale, L.A. stated, 'Rick—you're the attorney—let's figure it out. Too late to turn back.'

25

"63.     On September 13, 2013, L.A. and Hodge Acquisitions amended the purchase agreement regarding the ranch, increasing the sale price to $590,000.00. At the time the respondent purchased the ranch for $590,000.00, the Sedgwick County Treasurer valued the ranch at $956,540.00. And, as of September 5, 2013, the ranch was appraised at $1,800,000.00.

"64.     On September 13, 2013, L.A. and the respondent also entered into a residential lease agreement. The residential lease agreement did not reflect L.A.'s understanding of the agreement between the parties. L.A. believed that '[a]ll monies paid toward the home will be applied to the re-purchase of the home as a rent to own condition. In [*sic*] the amount of $590,000 plus interest of 5%.'

"65.     On September 12 or 13, 201[3], the respondent sent the following email to P.S. regarding the CLS deal:

. . . .

'I wanted to visit with you about the sale of CLS assets to Yard Concerns. It appears the transaction may not go through because there are several tax, bank. And [*sic*] vendor liens that encumber the property. In fact, the liens and amounts owed are far greater than the value of the CLS accounts and all of the assets. I was also informed that Equity Bank may look to foreclose.

'According to the bank and the creditor's [*sic*] the liens are for about $442,000.00 on equipment and $292,000.00 on the real estate. Yard Concerns cannot pay $442,000.00 for equipment and an additional $200,000.00 to you because CLS' assets are not even worth the $442,000.00 that is owed, let alone $642,000.00. I feel it would be a very bad business decision.

26

'I do think that I could acquire the real estate from Equity and clear you and CLS from that debt. I also think I could take care of the RMI loan and get you and CLS out of that debt. I may be able to work out eliminating the rest of the debt for the equipment, but Yard Concerns cannot pay any more for CLS assets. I know you were wanting to receive funds out of the sale of CLS assets, however, Yard Concerns could not sustain itself if it were to pay such a large sum of money for business assets that are not worth the asking price. I am fearful that Yard Concerns would fail.

'Do you have any thoughts?'

"66.    On September 16, 2013, the respondent sent an email to L.A. which included the following:

'Another massive issue has come up surrounding CLS' attempt to sell its assets to YC. This will affect payroll today because YC cannot hire CLS employees, nor purchase its assets, nor transfer any money to it or its employees. To do so would expose it, its employees, and YC to serious problems.

'The garnishment for CLS is still in effect. All money for CLS assets has to legally be paid to Carl Davis. YC cannot pay CLS emotes [*sic*] because such activity would appear deceptive and potentially fraudulent. Of course, everything done must be above reproach.

. . . .'

The garnishment was nothing new. It had been in effect for months. Additionally, prior to that time, the respondent or Yard Concerns had already paid CLS' payroll and other expenses. Finally, Yard Concerns was receiving payments made to CLS.

27

"67. On September 18, 2013, the respondent sent an email message to L.A. and various CLS employees, indicating that he was attempting to acquire assets of CLS held by one creditor and attempting to transfer a large account to Yard Concerns.

"68. That same day, L.A. wrote to the respondent.

'. . . I DO NOT UNDERSTAND WHY FRIDAY AFTER FIVE YOU WERE GOING TO RUN PAYROLL AND HAVE IT DELIVERED AND THEN MONDAY CHOSE NOT TO? What possibly could have changed over the weekend? Yard Concerns has nearly $40k of CLS's money! I understand the garnishment by Hadden, but you have already been issuing payroll and expense items previously. You have requested all logos be stripped from CLS vehicles and now CLS is performing illegally. I am not happy to say the least! I have signed my home over to you as collateral for the Asset Purchase and you seem to not possess the ability to confirm our verbal agreement regarding the "rental" payments be applied to the $590k and purchasing MY home back!!!! I understand you may have limited access to your email, this in no way should have impacted the employees, or ME, for that matter this week, based on our conversation after five o'clock on Friday!

'In closing, if [*sic*] feels like I/CLS/Employees are being SCREWED!! When you get back, we need to meet immediately. YC and CLS has [*sic*] an enforceable document. You have been privy to every negative item (that's how we met), inclusive of the meeting with BKD explaining the tax situation, not to mention that Hinkle law sent you every case on file. I would also like to know why you are wildly advising CLS not to declare bankruptcy.'

"69. About this same time, L.A. called Ms. Michaud. Ms. Michaud testified about this telephone call, as follows:

28

'A.     She called me and she was crying and she told me that Mr. Hodge left the country and didn't pay her as they had agreed so she couldn't pay her payroll and said that he—that he wasn't doing what he agreed that he was going to do.

'Q.     Did she elaborate?

'A.     Yes. And I—I can tell you generally what I remember, although it may not be verbatim things, but she just said, 'um—I mean, something to the effect that he's taking—these aren't her exact words, but taking advantage of me, 'um, stealing the house from me. And I—I had always thought that the agreement was that he was basically loaning her the money and she was going to make payments, and by making payments she would get the house. I mean, 'cause I said he's not getting the house from you, is he? And she said he's trying to, which was just different than—you know, and then she kept talking and I kind of didn't want to hear any more 'cause I couldn't do—you know, I couldn't do anything. I—I wasn't her attorney and I didn't want to have anything to do with it and I just said didn't you have anybody look at that before you signed it.

'Q.     When you say "anybody look at it", what did you mean?

'A.     Whatever agreement or contract, or whatever she had with Mr. Hodge.

'Q.     Did you mean an attorney, have an attorney look at it?

'A.     Yes.

'Q.     Did you use that word with her?

'A.     I don't know if I did or not.

29

'Q.      Did she answer that question?

'A.      Yes.

'Q.      What did she say?

'A.      She said that she—she couldn't afford to have anybody else help her.'

"70.    On September 18, 2013, during a telephone conversation, L.A. asked Mr. Lazzo to recommend an attorney familiar with Chapter 11 bankruptcy. That same day, in an email message, Mr. Lazzo recommended that L.A. contact David Eron for that purpose. On September 19, 2013, on behalf of CLS, L.A. retained Mr. Eron.

"71.    On September 23, 2013, the respondent sent L.A. an email message with an attached letter, revoking Yard Concern's offer to purchase CLS' assets because CLS retained counsel to file chapter 11 bankruptcy. The letter, addressed to the Board of Directors and Shareholders of CLS, provided:

'Please be advised that Yard Concerns, L.C. has been advised that Complete Landscaping Systems, Inc. has retained counsel to file a petition for relief under Chapter 11 of the Federal Bankruptcy Code.

'As such, Yard Concerns, L.C. hereby revokes its offer to purchase assets from Complete Landscaping Systems, Inc. Should you wish to discuss the possible sale of assets to Yard Concerns, L.C. in the future, please do not hesitate to contact me.'

Also on September 23, 2013, the respondent informed Mr. Eron that Yard Concerns revoked its offer to purchase assets of Complete Landscaping Systems, Inc. At the time the respondent, through Yard Concerns, revoked its offer to purchase CLS' assets, Yard Concerns had already taken possession of assets and had been collecting the accounts receivables.

30

"72.    On September 23, 2013, the respondent sent an email message to P.S., which provided as follows:

'I believe she is going to try and file very quickly. If you want to take the company back you will have to follow the processes in your buy/sell agreement. I think a right to cure notice has to be sent and you may have to give her 30 days to respond.

'Did she ever tell you that she is broke and CLS is broke?'

"73.    P.S. responded:

'I have called Eric Lomas with Klenda Austermann [*sic*] but he has not called me back yet. She told me that her attorney has a meeting with you tomorrow, is that true? She says that she is meeting with another attorney about Chapter 11 Wednesday morning.

'She has not told me that she or CLS are broke. (I have every reason to believe that she is.)

'I have told her that due to lack of payments, lawsuits and now bankruptcy she in [*sic*] default of our agreement and that I was consulting with an attorney about my next step.

'What are your thoughts?'

"74.    The respondent replied:

'I think she is trying to figure out a way to get out of a bad situation that she put herself in. What is crazy is that I have almost everything worked out to make this deal happen and it could be completed by the end of this

week or first of next, but I guess she is mad because she didn't get her way.

'It's too bad because I could save the jobs and grow the business.'

P.S. then asked the respondent whether he could 'make [L.A.] understand the situation?'

"75.     On September 24, 2013, in an attempt to 'make [L.A.] understand,' the respondent sent an email to L.A., her current husband, M.A., and her former husband, P.S. The email message provided as follows:

'Dear [L.A.] and [P.S.],

'I wanted to share with you both that I feel this matter has unnecessarily gone way off track. If you both feel that chapter 11 bankruptcy is the best thing for CLS, then you must do what you think is best. I would caution you that it is not what you think. I am not giving legal advice, and I am not writing you while wearing my lawyer hat, but you really don't understand what you may be doing and how dangerous it can be.

'In chapter 11 the United States Trustee (government attorney) will be supervising everything CLS does. The UST will require monthly operating reports that must comply with certain rules and requirements. CLS will be required to open Debtor in Possession bank accounts and all spending will be supervised. All new income and employee tax liabilities will be required to be paid and be kept current, all insurance will be required to be paid and kept current. The amount of capital required to do this will be very large. You will also have to pay certain amounts of money to your creditors and taxing authorities. The capital required to operate further will also be large.

32

'A creditor committee will be formed that comprises [sic] of some of the largest companies and people CLS owes money and this group will be authorized to hire forensic accountants to audit all of the financial transaction and payments CLS made to creditors and employees, and to explore CLS' books. The committee will also hire an attorney to review contracts and will look for legal misdoing. The group will search of [*sic*] any wrongdoing or questionable actions. It will likely incur substantial legal and accounting fees, and CLS will be responsible to pay for all of it.

'Interest [*sic*] persons (creditors) can also seek to have a [*sic*] [L.A.] replaced with another person to run the company. This means neither of you would likely have control over what happens to CLS or its business. Even worse, the UST or other interest [*sic*] party can see to have the case converted to a chapter 7 bankruptcy. This would liquidate everything CLS has and CLS will cease to exist. CLS may succeed, however, statistically the odds are against it. If the chapter 11 does not work then CLS will likely [be] forced into a chapter 7 liquidation and will go out of business. Moreover, a bankruptcy by CLS will invoke triggering events that can terminate the buy/sell between the two of you. This is the hard route and is not necessary. Do you really want to open the door to more litigation from creditors while you pay their legal and accounting fees? Not to mention having the federal government in your business?

'Mr. Lazzo is a good attorney, however, he represents Equity bank. Don't think for a moment that he has your best interest in mind. He can't because he has to look out for his client. Mr. Eron is also a good attorney and he will guide you the best he can, however, he has no idea yet of the magnitude or complexity of CLS' dealings. I fear that you will be opening Pandora's box if you continue down this path.

33

'The easy route is to continue with what we started and finish it up. Everything [*sic*] in place and the whole thing should be accomplished by next week. This gives each of us what we want, it saves jobs, promotes economic growth, and allows for service to continue to patrons. Remember, it took a while for CLS to get into this mess. It is reasonable for it to take a while to get things back to good.

'I do not have hard feelings and I like both of you quite well. I think [M.A.] is a good guy, too. I understand that each of you may be upset because sometimes these matters get complicated and you may not understand everything. However, I have always been honest and truthful. Things must be done legally and lawfully. Nothing is intended to hurt anyone, it is to help everyone. If you feel that you wish to take the easy route, please let me know.'

By Pandora's Box, the respondent was referencing that P.S. and L.A. took money out of CLS and used that money for the down payment on the ranch.

"76. On September 24, 2013, L.A. forwarded the respondent's email to Mr. Eron [and] asked whether she should proceed with the sale of CLS' assets as suggested by the respondent. Mr. Eron advised L.A. to file Chapter 11 bankruptcy.

"77. On September 24, 2013, Mr. Eron wrote to the respondent:

'Thanks, Rick. At this time I would ask, as the attorney for Complete Landscaping, that you refrain from communicating directly with my client or its agents or principals regarding any issues. As the former attorney for Complete Landscaping, please also refrain from communicating with any third parties concerning Complete Landscaping. It has come to my attention that you have disclosed the intended chapter 11 filing to third parties. If true, this raises issues of confidentiality, privilege, and conflict of interest. I hope that you can understand the importance of communicating only with me concerning the very

34

sensitive and precarious position of our client. In particular, you should not communicate with or meet with [P.S.], who is neither an owner nor an officer of Complete Landscaping. I will handle all communications with you from this point forward, and will discuss with Complete Landscaping what should be communicated to third parties and to which parties that communication should be directed. I look forward to seeing you at 4 p.m. Thank you.'

"78.     The respondent responded that '[a]ll communication after your retention has been outside my capacity as an attorney. . . .'

"79.     Mr. Eron reasoned:

'Rick, I am not sure that it is possible to communicate "outside your role as an attorney." When you undertake to represent a client, and you also conduct business transactions with that client, I confess that I do not understand how one can alternate between roles. Because you represent (or represented) [CLS], you have fiduciary duties to protect the company's interests. When I communicated to you that our client was filing for chapter 11, I did so with the understanding that you were the company counsel representing them in litigation and in possession of many of their files (including a retainer agreement). Again, and on this basis, please refrain from all further communication with any persons concerning this matter. As an attorney for [CLS], my client asserts that your duties of confidentiality and privilege remain fully intact, regardless of your business arrangements.'

"80.     On September 24, 2013, P.S. named himself the resident agent for CLS.

"81.     The respondent wrote to Mr. Eron on September 25, 2013. That message included:

'It's rule 5.7, in conjunction with 1.9.

35

'[L.A.] and [P.S.] expressed a desire to meet with me and they have the right to do so considering the applicable rules, my role in non-law related enterprises, and "tif" legislation.

. . . .

'Lazzo's client wants to do a 363f and move the business as a going concern. This is contrary to the offer made by Yard Concerns, however, it would entertain the same if structured appropriately.

'There is another option outside of 7 or 11, this would involve acquisition of existing notes, working with Lazzo's client, and shutting down CLS. Given the Pandora's Box that will likely be opened if CLS enters bankruptcy, this probably [*sic*] the better route.'

"82.    Later that day, the respondent, Mr. Eron, and L.A. met. Following the meeting, Mr. Eron sent the respondent a list of action items for the respondent to accomplish:

'1.    Provide an itemized list of all checks currently being held by you that are payable to Complete Landscaping or Yard Concerns.

'2.    Transmit all CLS checks to my office.

'3.    Retain Yard Concerns checks until after the chapter 11 is filed and then endorse them over to CLS and transmit directly to CLS.

'4.    Provide an itemized list of all checks payable to Complete Landscaping that were previously transmitted to CLS.

'5.    Provide an itemized list of all checks payable to Yard Concerns that were previously returned to CLS customers.

36

'6.     Transmit all funds being held in [*sic*] Yard Concerns bank account to my trust account. . . .

'7.     Transmit any emails in your file regarding customer contacts to [L.A.] (to the extent not previously transmitted).

'8.     Deliver the desk, telephones, and computer equipment to CLS on Friday, September 27.

'9.     Transmit your complete electronic file concerning CLS to me (CD or thumb drive would be fine).

'10.     Transmit copies of the informed consent agreement and contract concerning [L.A.]'s home to my office (preferably via email).

'11.     Change the registered agent for CLS to [L.A.] (or assist her with this process).

'12.     Send [*sic*] letter to all CLS clients rescinding the previous notice to send all payments and correspondence to Yard Concerns.

'13.     Arrange for Keith Latham to visit CLS to remove any newly introduced sotftware systems or remote access programs from the server and all electronic devices.

'14.     Transmit a complete list of passwords/usernames/PIN's for any accounts or electronic devices to [L.A.].'

"83.     The respondent agreed to review the action items and again suggested that L.A. proceed with the original deal with Yard Concerns.

"84.    Mr. Eron replied:

'There is no way to make that work, Rick. In order to transfer the assets free of liens, we would have to get tax clearance certificates, which is impossible. Even leaving that aside, the original deal with YC would leave [P.S.] and [L.A.] on the hook for the entirety of the unpaid taxes, which are substantial. To say nothing of the real property, which by now has judgment liens and lis pendens problems. [L.A.] has also personally guaranteed the obligations of the company to [P.S.], which YC was not assuming. The proposed transaction also involved substantial possibilities that YC would be sued by the creditors of CLS under the UFCA. In short, the only way to properly liquidate this company for the best price possible is through a chapter 11 sale. That being said, it only makes sense if the company can at a minimum pay its secured and priority debts and can demonstrate that it is receiving the highest and best offer for its assets. If not, a reorganization is the most effective approach. We have yet to decide how that gets accomplished. But for now, a chapter 11 filing is critical to avoid the piecemeal dismantling of this company and loss of valuable contracts, which could be assumed and protected in chapter 11.'

"85.    Pursuant to the list of action items, on September 25, 2013, the respondent sent CLS' clients a letter notifying them that Yard Concerns had cancelled the agreement to acquire CLS' accounts.

"86.    On September 25, 2013, the respondent contacted Mr. Lazzo, counsel for Equity Bank, and asked if the bank would foreclose on CLS' building loan and sell the real property to the respondent.

"87.    On September 30, 2013, CLS filed for the protections of Chapter 11 of the bankruptcy code.

38

"88.     On November 4, 2013, L.A. filed a complaint with the disciplinary administrator's office against the respondent.

"89.     On April 25, 2014, CLS through its bankruptcy attorney filed an adversary proceeding against L.A., P.S., Hodge Acquisitions, Shannon Michaud as trustee of the Gerald L. Michaud Family Trust, and Shannon Michaud as trustee of the Shannon Michaud Trust. On December 29, 2014, the court dismissed the [*sic*] Shannon Michaud as trustees [*sic*] for the trusts from the adversary proceeding.

"90.     On July 2, 2014, P.S. filed an amended cross-claim in the CLS bankruptcy. In the filing, P.S. alleged that the respondent's purchase through Hodge Acquisitions of the ranch was a fraudulent conveyance or transfer as the purchase was for substantially less than the value.

"91.     On December 8, 2014, L.A. filed an adversary proceeding against Hodge Acquisitions, alleging that the sale of the ranch was a fraudulent conveyance. L.A. sought rescission of the contract.

"92.     That same day, CLS, through its bankruptcy counsel, filed a second adversary proceeding against L.A. for taking money from CLS to purchase the ranch and for other purposes.

"93.     On February 13, 2015, CLS, Hodge Acquisitions, L.A., and P.S. entered into a settlement agreement and release which provided as follows:

<u>'SETTLEMENT AGREEMENT AND RELEASE</u>

'THIS SETTLEMENT AGREEMENT AND RELEASE ("this Agreement") is entered into as of the 13th day of February, 2015, by and between Complete Landscape Systems, Inc. ("Complete"), Hodge Acquisitions, LC ("Hodge"), [L.A.], and [P.S.], the foregoing collectively referred to as the "Parties"). This Agreement also includes the bankruptcy estates of Complete and [L.A.]

39

'The following recitals are a material part of this Agreement.

'WITNESSETH:

'WHEREAS, this Agreement is made as a compromise between the parties for the complete and final settlement of their claims, differences and causes of action with respect to the dispute described below; and

'WHEREAS, [P.S.] was the sole shareholder and president of Complete between 1983 and December 30, 2009, and again between February 2014 and the present;

'WHEREAS, [L.A.] was the 99% shareholder and president of Complete between December 30, 2009 and February 2014;

'WHEREAS, on December 17, 2010, [L.A.] and [P.S.] agreed to purchase a home located at 11015 E 63rd Street S, Derby, KS 67037 and legally described as the East Half of the Northeast Quarter of Section Thirty-three (33), Township Twenty-eight (28) South, Range Two (2) East of the Sixth Principal Meridian, Sedgwick County, Kansas ("the Home") [*sic*]

'WHEREAS, as part of the purchase of the Home, [L.A.] and [P.S.] also purchased certain personal property, included but not limited to a small girl statue, Joy of Music bronze statue, bronze eagle statue, golf cart, pontoon boat, kitchen bar stools, pavilion rugs, a wood bench next to the master bedroom, a refrigerator in the guest cottage, and sound equipment in the formal living room and family room (collectively "the Personal Property");

40

'WHEREAS, [P.S.] subsequently transferred his interest in the Home to [L.A.];

'WHEREAS, on August 20, 2013, Hodge agreed to purchase the Home from [L.A.], paid off the then existing mortgage on the Home, and took out a new mortgage held by Southwest National Bank ("the Mortgage");

'WHEREAS, in addition to the Mortgage, Hodge also invested additional funds into the purchase of the Home, including but not limited to a down payment, certain repairs and/or improvements, homeowner's insurance, and principal and interest payments on the Mortgage. Hodge has also received certain funds relating to the Home, including lease and adequate protection payments. The investments, less receipts, are referred to in this Agreement as the "Cash Investments". Such Cash Investments as of the date of this Agreement are set forth in Exhibit "A", and will be subject to adjustment upward based upon additional funds invested or downward based upon additional receipts;

'WHEREAS, on September 20, 2013, Complete filed a chapter 11 bankruptcy proceeding in the District of Kansas, Bankr. Case No. 13-12530 ("the Complete Bankruptcy");

'WHEREAS, on April 25, 2014, Complete filed Adv. Proc. No. 14-5058 seeking to recover a money judgment against, *inter alia*, Hodge, [L.A.], and [P.S.], turnover of the Home and Personal Property from the same, and disallowance of any claims held by [P.S.] or [L.A.] ("the First Complete Adversary");

'WHEREAS, on July 22, 2014, [L.A.] filed a chapter 11 bankruptcy proceeding in the District of Kansas, Bankr. Case No. 14-11683 ("the [L.A.] Bankruptcy");

41

'WHEREAS, on December 8, 2014, Ackerman filed Adv. Proc. No. 14-5200 against Hodge seeking *inter alia* reversal of the sale of the Home ("the [L.A.] Adversary").

'WHEREAS, on December 8, 2014, Complete filed Adv. Proc. No. 14-5201 seeking to recover a money judgment against [L.A.], turnover of the Home and Personal Property from [L.A.], and non-dischargeability of all alter ego claims against [L.A.] ("the Second Complete Adversary");

'WHEREAS, the defendants in the adversary proceedings have denied, and continue to deny, the allegations and/or that plaintiffs are entitled to any recovery.

'WHEREAS, [L.A.] and [P.S.] each assert that they hold certain general unsecured, priority, and/or administrative claims against Complete;

'WHEREAS, the Parties desire to settle and compromise and do hereby resolve their respective differences in the manner and details as hereinafter set forth.

'NOW, THEREFORE, in consideration of the mutual covenants set forth herein, the parties hereto agree as follows:

'1. The Preamble Clauses set forth above are fully incorporated herein and are made a part of this Agreement as if fully set forth herein.

'2. [L.A.] shall continue to occupy the Home until March 31, 2015, at which point she shall vacate the Home. During the remaining period of her occupancy, she shall make the adequate protection payments to Hodge required by Doc. No. 56 in the [L.A.] Bankruptcy, and Hodge shall use such payments to make payments on

42

the Mortgage and homeowner's insurance. At the time [L.A.] vacates the property she shall leave the Property in a clean condition, removing any trash or debris and any personal property not included in the transfer to Complete. During her occupancy, [L.A.] shall keep the Property in good condition and shall not allow the Property to deteriorate in any fashion, either through action or omission, excepting only normal wear and tear, ordinary use, damage and deterioration caused by acts of God or accidents, damage potentially caused by third parties, and deterioration that results from issues already present at the Home. Any missed adequate protection payments or cleanup and trash removal costs shall constitute an additional, non-dischargeable amount owed by [L.A.] under this Agreement. [L.A.] shall have seven days to raise an objection to cleanup and trash removal costs attempted to be assessed under this Agreement. In the event that such an objection is raised, the allowable amount of such cleanup and trash removal costs shall be subject to Bankruptcy Court review in a manner consistent with the terms of the Agreement. To the extent that [L.A.] remains in the Home passed [*sic*] March 31, 2015, she shall pay another month's adequate protection payment to Hodge, plus a penalty of $5,000 to Complete, for each month or part thereof during which she holds over.

'3.      Complete will sell the Home. The Home shall be sold by McCurdy Auction, LLC ("McCurdy") on or before May 31, 2015 or as soon as McCurdy, in consultation with Complete and Hodge, deems appropriate. The Home may be sold subject to a reserve price, subject to any separate agreement between Complete and Hodge. Any such reserve shall not be disclosed. Complete shall sign any necessary agreements with McCurdy. If the reserve price is not reached at auction, Complete will consult with McCurdy as to a final sale, and may e.g. except a sale price McCurdy might negotiate after the auction sale itself, again subject to any separate agreement between Complete and Hodge. In the event that Complete cannot obtain a contract for the sale of the Home under the terms of this ¶, within four (4) months of the Effective Date of this

43

Settlement Agreement, Hodge may seek a Court order authorizing foreclosure of its lien as set out in ¶ 4 herein. Any such foreclosure may be granted in the same proceeding in Bankruptcy Court authorizing relief.

'4.     Pursuant to this Agreement, the transfer of funds to [L.A.] and/or [P.S.] from Complete as set out in the First Complete Adversary will be avoided. Such funds will be deemed traced in part to the Home and Personal Property as purchased by [L.A.] and [P.S.]. Hodge agrees that the funds may be so traced notwithstanding the sale of the Home to it by [L.A.]. Complete may therefor recover the Home and Personal Property pursuant to 11 U.S.C. §550(a). Notwithstanding, Hodge will retain a lien for payment of the Mortgage and that [*sic*] Cash Investments pursuant to 11 U.S.C. §548(c) and/or §550(e). However, although [L.A.] agrees that Hodge will retain a lien for the Mortgage and Cash Investments, she does not agree that such lien may be based on the cited statutes. Further, she retains the right to assert such in any proceeding not otherwise resolved by this Settlement Agreement. Proceeds from the sale of the Home and Personal Property that are retained by Complete shall first be applied to transfers to [L.A.] booked as loans.

'5.     After [L.A.] vacates the Home, Hodge shall continue to maintain payments for the mortgage and insurance associated with the Home, subject to reimbursement as additional Cash Investments. Hodge shall assign any right to pursue appropriate insurance claims on the Home to Complete, to obtain compensation and/or repair for the Home, including but not limited to damage to the roof(s) and the indoor pool. Hodge will cooperate with Complete as necessary to effectuate such assignment. Complete shall decide whether to retain cash payments from any insurance proceeds, in which case they will be added to the Net Proceeds, or use such proceeds to complete appropriate repairs. To the extent that any cash proceeds are retained, they shall be held [in an] Eron

44

Law trust account pending distribution under this agreement. The Parties, and each of them, shall cooperate fully with McCurdy and any other sales professionals by providing access to the Home and appropriate information/documentation as to the same.

'6.     This Agreement shall require the approval of the Bankruptcy Court in the Complete and [L.A.] Bankruptcies. The Effective Date of this Agreement shall be the date of the approval of this Agreement by the Bankruptcy Court. The Parties shall use their best efforts to obtain approval of the Bankruptcy Court. In the event that the Agreement is not approved, this Agreement and all provisions contained herein shall be deemed null and void. In that event, the Parties shall consent to a reasonable extension of all deadlines in the Complete First and Second Adversary cases and the [L.A.] Adversary.

'7.     Upon approval of this Settlement Agreement, orders will be entered in the First and Second Complete Adversary Actions and the [L.A.] Adversary, providing that each is resolved pursuant to the terms of the approved Settlement Agreement.

'8.     Upon the Effective Date of this Agreement, Complete shall be deemed the sole owner of the Personal Property. The transfer of the personal property from [L.A.] to Complete is made without any warranties related to the condition of such property, except that such property will be free from any intentional damage caused by [L.A.]. The Personal Property may be sold with the Home by McCurdy, or by separate auction or private treaty sale. The sale of the Personal Property shall be subject to final approval by the Bankruptcy Court. The net proceeds from the sale of the Personal Property shall be treated in the same manner as the proceeds from the Home, as set forth in detail below, as if the Home and Personal Property had been sold together. Together, the net proceeds of the Home and Personal Property will be the "Net Proceeds" as described and referred to in this Settlement Agreement. The

45

Personal Property shall be sold no later than July 31, 2015 or as soon thereafter as any professional employed to sell the Personal Property deems appropriate. The Parties, and each of them, shall cooperate fully with Complete and any sales professionals, including but not limited to, by providing access to the Personal Property for inspection and/or removal, and by providing appropriate information.

'9.    The proceeds from the sale of the Home shall first be used to retire the Mortgage. The proceeds shall then be used to pay for all costs of the sale, including but not limited to, pro rata property taxes, transfer or sales taxes, title and document fees, escrow and title insurance fees, sales commissions or fees, and any other customary costs of sale. The proceeds will then be paid to Hodge for its Cash Investments, less any funds received by Hodge on account of the Home prior to the sale (such as lease or adequate protection payments). The remaining proceeds shall be included in the "Net Proceeds" under this Agreement.

'10.    Out of the Net Proceeds, Hodge shall receive an amount equal to 1.5% of such of the Net Proceeds as shall be equal to or less than $1,200,000 and 2% of the Net Proceeds which are greater than $1,200,000, on account of its attorney fees incurred in the herein bankruptcy matters, adversary proceedings, or related state court eviction litigation, such amount not to exceed the actual fees so incurred. All such fees shall be paid directly to Klenda Austerman, LLC.

'11.    Out of the Net Proceeds, [L.A.] shall receive an amount equal to 0.5% of such Net Proceeds, on account of her allowed attorney fees incurred in the herein bankruptcy matters, including adversary proceedings, such amount not to exceed $15,000 or the actual fees so incurred, whichever is less. All such fees to [L.A.] shall be paid directly to Redmond & Nazar, LLP.

46

'12.     The Parties hereby release, hold harmless and discharge each other and their heirs, executors, administrators, agents, successors and assigns, and legal representatives from any and all claims, demands, damages, actions, causes of action, or suits at law or in equity, of any kind or nature, in any manner arising out of and with respect to the above-described disputes or other relationship, contracts or agreements between the Parties prior to the execution of this Agreement ("the Release"). The release of Hodge shall extend to and include Rick E. Hodge, Jr., and Rick E. Hodge, Jr. shall release all other Parties to this Agreement in the same manner. The Release shall cover any claims of [L.A.] and/or [P.S.] for wages or other priority claims against Complete, and shall cover any claims of Complete against [L.A.] and/or [P.S.] for misfeasance or malfeasance. The Release shall also cover all claims between [L.A.] and Hodge, in the Kansas state court eviction proceeding, or the [L.A.] Adversary Proceeding. The foregoing notwithstanding, nothing in this Agreement shall prevent Hodge from pursuing the eviction action against [L.A.] in the event that she fails to make adequate protection payments, or fails to vacate the Home by March 31, 2015, or Hodge or Complete from pursuing damages under ¶2 of this Settlement Agreement.

'13.     The Parties to this Agreement hereby acknowledge and agree that the Release set forth in the above paragraph is a general release with respect to the subject matter set forth in the Complete and [L.A.] Bankruptcies, the Complete First and Second Adversaries, and the [L.A.] Adversary. The Parties to this Agreement hereby further acknowledge and agree that this Agreement is and shall be deemed a compromise of disputed claims and neither any statements contained herein nor this Agreement as a whole shall be construed as an admission of liability.

'14.     The Parties acknowledge, represent and agree that this Agreement is not intended to be, and shall not be construed as, an

47

admission of fault or liability, to any extent whatsoever, by any of the Parties, or any third-party or entity. The Parties also acknowledge, represent and agree that they have entered into this Agreement solely for the purpose of avoiding the uncertainty and expense of proceeding with litigation and will make no statements to the contrary.

'15.     The Parties warrant that no promise or agreement not herein expressed has been made; that this Agreement is not executed in any reliance upon the statement or representation made by the Parties hereby released or by said Parties' representatives or agents concerning any matter; that the above consideration, once paid in full, is accepted in full compromise settlement and in accord and satisfaction of all claims and demands, including all consequences thereof, which may hereafter develop as well as those already developed or now apparent relating to or arising out of any claim, demand, action or recoveries by and between the Parties. This Release is contractual and not merely a recital and is fully understood and agreed that this Release is a compromise settlement of all claims referred to herein or related hereto.

'16.     The Parties have entered into this Agreement voluntarily, having fully read and fully understood the meaning and effect of all its terms and provisions, and fully understanding its and their costs and risks. Each party has consulted with its legal counsel and/or understands and agrees that it has had the opportunity to consult with its legal counsel concerning this Agreement. Further, the Parties have conducted such discovery and/or inquiry as they deem necessary and advisable prior to entering into this Agreement. Except as to the agreements, warranties, releases, covenants and reservations made or contained in this Agreement, the Parties enter into this Agreement understanding that facts or other circumstances may exist which are undisclosed, or which are different from or other than those which they believe to be the case, and the Parties voluntarily assume all risks

48

attendant to such undisclosed, affiliate or additional facts or circumstances.

'17. This Agreement constitutes the Parties' entire agreement concerning the specific issues and subjects addressed herein and shall supersede any and all previous or contemporaneous agreements and understandings concerning those issues and subjects, all of which are merged in this Agreement. This Agreement has been the subject of negotiations and discussions between and among the Parties, so that any rule construing ambiguities against the drafter shall have no force and effect.

. . . .'

On February 24, 2015, CLS through its bankruptcy attorney, filed a motion to approve the settlement. Thereafter, the court dismissed the adversary actions filed against L.A. and by L.A.

"94. On May 9, 2015, CLS sold the ranch at public auction for $1,017,500.00.

"*Respondent's Role*

"95. Having found the relevant facts in this case, the hearing panel now turns its attention to the alleged rule violations. In order for KRPC 1.7 and KRPC 1.8 to apply, the respondent must have an attorney-client relationship with CLS and/or L.A. The respondent became attorney of record for CLS in the *Hadden* litigation in May, 2013. The respondent asserted that he terminated the attorney-client relationship with CLS following the July 29, 2013, email exchange with L.A.

"96. The respondent's actions speak louder than his words. Following the July 29, 2013, email exchange, L.A. continued to request legal advice from the respondent, the respondent continued to provide legal advice to L.A., and L.A. continued to accept the advice. *See* ¶¶ 32-69 above. The respondent continued to possess and exercise great

influence over L.A. and her decisions. *See* ¶¶ 32-69 above. Further, the respondent never withdrew as attorney of record in the *Hadden* collection litigation. L.A. and the respondent executed documents related to the respondent's purchase of the ranch in the respondent's law office. Finally, after July 29, 2013, the respondent sent more than 20 email messages to L.A. and others concerning CLS and the ranch using his attorney signature block.

"97.    At the hearing on this matter, the respondent explained his view of his obligation to CLS following the July 29, 2013, email exchange:

'. . . Some people believe that a lawyer is a lawyer is a lawyer all the time. There are people that think that that's okay and they're probably not business people. They're probably great students, went to law school, got jobs as lawyers at firms and they are lawyers. That's what they do, and that's awesome. I employ people like that and I have attorneys on retainer that are like that. 'Um, there are others of us who are attorneys but we're also business people, and sometimes we think like business people, sometimes we think like attorneys. With regard to the termination of representation, once that was done, I switched into business person mode, because now I don't have an obligation to Complete in the form of advising it about bankruptcy or the *Hadden* matter or—or any of that.'

The respondent's argument can be summarized as follows:  Because he switched hats and was thinking and acting as a business person and not as an attorney, the Kansas Rules of Professional Conduct do not apply. The hearing panel rejects the respondent's argument in this regard. Because the respondent continued to act as an attorney, the respondent is to be treated as an attorney. Thus, the respondent remained obligated to comply with the Kansas Rules of Professional Conduct. Further, even if the respondent did not remain as counsel for CLS, he would remain subject to the Kansas Rules of Professional Conduct. *E.g., see* KRPC 1.9 [2017 Kan. S. Ct. R. 313(Duties to Former Clients)].

"98.    The hearing panel finds the rationale in *Double M Const. v. Kansas Corporation Comm'n*, 288 Kan. 268, 202 P.3d 7 (2009), to be analogous:

50

'Double M would have this court find that a corporation that specializes in excavation, enters into a contract to excavate, and then carries out an excavation is not really an excavator under the statute. It proposes that a creature that looks like a duck, walks like a duck, and quacks like a duck is not a duck if it contracts with a goose to assume the duties and liabilities of a duck.' 288 Kan. at 275.

Even though the respondent provided advice like an attorney, identified himself as attorney, corresponded using his attorney signature block, and met with L.A. regarding the sale of the ranch in his office; the respondent denies acting in his capacity as an attorney because he was thinking and acting as a business person. Under the analysis applied in *Double M*, the hearing panel concludes that the respondent's argument lacks merit. The Kansas Rules of Professional Conduct apply to the respondent in this case.

"99.     The respondent also argued that KRPC 5.7 provides a safe harbor for him in this case. KRPC 5.7 [2017 Kan. S. Ct. R. 365] provides:

'(a)     A lawyer shall be subject to the Rules of Professional Conduct with respect to the provision of law-related services, as defined in paragraph (b), if the law-related services are provided:

(1)     by the lawyer in circumstances that are not distinct from the lawyer's provision of legal services to clients; or

(2)     in other circumstances by an entity controlled by the lawyer individually or with others if the lawyer fails to take reasonable measures to assure that a person obtaining the law-related services knows that the services are not legal services and that the protections of the client-lawyer relationship do not exist.

'(b)     The term "law-related services" denotes services that might reasonably be performed in conjunction with and in substance are

related to the provision of legal services and that are not prohibited as unauthorized practice of law when provided by a nonlawyer.'

The respondent's theory that KRPC 5.7 provides him with a safe harbor is misplaced. The respondent continued to provide legal advice following the July 29, 2013, email exchange. Thus, KRPC 5.7 is inapplicable.

"100.    Further, the respondent attempted to explain some of his representation of CLS following the purported termination of representation when he testified that under the rules he was permitted to conduct 'wrap-up.' While the respondent did not identify the rule on which he was relying, the hearing panel concludes that he was relying on KRPC 1.16(d) [2017 Kan. S. Ct. R. 331], which provides:

'Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.'

The respondent's post-July 29, 2013, conduct was not limited to what is clearly stated in KRPC 1.16(d). L.A. continued to seek advice, the respondent continued to provide advice, and L.A. continued to follow the respondent's advice. Accordingly, the hearing panel concludes that the respondent's continued representation is not permitted by KRPC 1.16(d).

"101.    Moreover, in Kansas, an implied attorney-client relationship is recognized when the client seeks and receives personal legal advice from the attorney.

'The authority of an attorney begins with his retainer; but the relation of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be

52

implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession.' *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 266 Kan. 1047, 1053, 975 P.2d 231 (1999).

*See also In re Adoption of Irons*, 235 Kan. 540, 684 P.2d 332 (1984) (Attorney created implied attorney-client relationship even when the attorney did not intend to do so.). And *see In re Walsh*, 286 Kan. 235, 250, 182 P.3d 1218 (2008) (where the respondent attorney was held to be subject to the Kansas Rules of Professional Conduct, even for conduct allegedly committed by the respondent 'when he was not acting as an attorney') and *In re Bowman*, 298 Kan. 231, 238, 310 P.3d 1054 (2013) (attorney suspended, *inter alia*, for conduct while acting as the administrator of an estate, and not as an attorney).

"102.    While the respondent never entered his appearance on behalf of L.A. in any litigation, he certainly provided her with legal advice regarding a matter that was purely personal in nature, the sale of the ranch, property owned personally by L.A. In addition to providing L.A. with advice regarding the ranch, the respondent also attended a meeting with L.A. and Ms. Michaud concerning the mortgage on the ranch and the respondent communicated on behalf of L.A. with Ms. Michaud. The hearing panel concludes that the respondent created an implied attorney-client relationship with L.A. with regard to the ranch.

"103.    Under *Associated Wholesale Grocers* and *Irons*, the hearing panel concludes that the respondent created an implied attorney-client relationship with L.A. and the respondent's attorney-client relationship with CLS continued following the July 29, 2013, email exchange. Because the hearing panel concludes that the respondent had an attorney-client relationship with L.A. and continued to have an attorney-client relationship with CLS following the July 29, 2013, email exchange, it is appropriate to consider whether the respondent violated KRPC 1.7 and KRPC 1.8.

"104.   KRPC 1.7 provides:

'(a)     Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1)      the representation of one client will be directly adverse to another client; or

(2)      there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

'(b)     Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1)      the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2)      the representation is not prohibited by law;

(3)      the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4)      each affected client gives informed consent, confirmed in writing.'

54

The respondent violated this rule in both the failed asset sale of CLS' assets as well as the real estate transaction with L.A.

"105.    First, the respondent violated this rule when he represented Yard Concerns and CLS simultaneously without obtaining informed consent from CLS. The respondent was the sole owner of Yard Concerns. The respondent sought to obtain the assets of CLS on favorable terms to Yard Concerns. L.A. had an interest in selling the assets of CLS at the highest possible price. Clearly, the simultaneous representation of both parties to a purchase agreement is 'representation of one client [that is] directly adverse to another client.' KRPC 1.7(a)(1). Additionally, there was a substantial risk that the representation of CLS would be materially limited by the respondent's responsibilities to Yard Concerns, as well as by a personal interest of the respondent as the sole owner of Yard Concerns. KRPC 1.7(a)(2). Thus, in order for the representation to be proper, the respondent was required to comply with KRPC 1.7(b).

"106.    In part, KRPC 1.7(b) requires that each affected client give informed consent, confirmed in writing. KRPC 1.0(f) [2017 Kan. S. Ct. R. 284] defines informed consent as:

> 'the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.'

In this case, the respondent failed to obtain informed consent as required by KRPC 1.7(b). The respondent did not adequately inform L.A. of the material risks and alternatives to selling CLS' assets to Yard Concerns, as required by KRPC 1.7(b)(4). For example, the respondent failed to adequately inform L.A. of the benefits to filing for the protections under chapter 11 of the bankruptcy code. Additionally, the respondent failed to inform L.A. of the risk that Equity Bank would call the note on the building if the assets of the business were sold. The hearing panel concludes that the respondent violated KRPC 1.7(a) when he represented Yard Concerns and CLS simultaneously in the sale of CLS' assets.

"107.    Second, the respondent also violated KRPC 1.7(a) with regard to his simultaneous representation of Hodge Acquisitions and L.A. in the purchase of L.A.'s ranch. Again, the respondent was the sole owner of Hodge Acquisitions. The respondent had a personal interest in obtaining the property at the lowest possible price. L.A. had an interest in selling the property at the highest possible price.

"108.    And, just like in the asset sale detailed above, Hodge Acquisitions' purchase of the ranch amounted to 'representation of one client [that is] directly adverse to another client.' KRPC 1.7(a)(1). There was also a substantial risk that the representation of L.A. would be materially limited by the respondent's responsibilities to Hodge Acquisitions, as well as by a personal interest of the respondent. KRPC 1.7(a)(2). Thus, in order for the respondent to simultaneously represent Hodge Acquisitions and L.A., the respondent was required to comply with KRPC 1.7(b).

"109.    Again, the respondent failed to comply with KRPC 1.7(b) because he failed to obtain informed consent from L.A. Because the respondent failed to obtain informed consent to the dual representation, the hearing panel concludes that the respondent violated KRPC 1.7(a) with regard to the sale of the ranch.

"KRPC 1.8

"110.    KRPC 1.8 prohibits business transactions between an attorney and his client unless certain circumstances are met:

'(a)    A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1)    the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; and

56

(2)     the client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of independent legal counsel on the transaction; and

(3)     the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.'

"111.     Additionally, '[a] lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client gives informed consent, except as permitted or required by these Rules.' KRPC 1.8(b).

"112.     The respondent violated KRPC 1.8(a) in the business transaction between CLS and Yard Concerns. In that matter, the respondent entered into a business transaction with a client and failed to satisfy subsections (1), (2), and (3) of KRPC 1.8(a). First, the terms on which the respondent acquired the interest were not fair and reasonable to CLS. Second, while the respondent gave 'lip service' to advising CLS of the desirability of seeking and providing a reasonable opportunity to seek the advice of independent legal counsel on the transaction, in actuality, CLS had no reasonable opportunity to do so. The respondent knew of the significant financial problems CLS was experiencing. The respondent knew that CLS did not have any funds to seek the advice of independent legal counsel. And, the respondent knew that he had not provided CLS with a sufficient period of time to seek the advice of independent legal counsel. Finally, CLS did not give informed consent, in writing, as defined above. As such, the hearing panel concludes that, with respect to the asset sale, the respondent violated KRPC 1.8(a).

"113.     The respondent violated KRPC 1.8(a) when he entered into a business transaction with L.A. for the sale of the ranch. Clearly, the terms on which the respondent purchased the property were unfair and unreasonable to L.A. The respondent purchased the property for approximately one-fourth the price that L.A. and P.S. paid the Michaud Family Trust. Further, the same month the respondent purchased the ranch, it was appraised at more than $1 million. Again, while the respondent suggested that L.A. seek

57

independent legal counsel on the transaction, he knew that she did not have sufficient time nor funds to do so. L.A. did not give informed written consent as required by KRPC 1.8(a)(3). Thus, the hearing panel concludes that, with respect to the real estate transaction involving the ranch, the respondent violated KRPC 1.8(a).

"114. The respondent also violated KRPC 1.8(b) with respect to both the asset sale and the real estate transaction involving the ranch. Throughout the summer of 2013, the respondent gained information regarding the financial circumstances of both CLS as well as L.A. personally. The respondent used that information to the disadvantage of CLS and L.A. in the two transactions. Neither CLS nor L.A. gave informed consent to the use of the information in that manner. Accordingly, the hearing panel concludes that the respondent violated KRPC 1.8(b) with respect to both matters.

"KRPC 1.9

"115. The disciplinary administrator alternatively alleged that the respondent violated KRPC 1.9. KRPC 1.9 provides, in pertinent part, as follows:

'(c)     A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1)     use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client or when the information has become generally known; or

(2)     reveal information relating to the representation except as these Rules would permit or require with respect to a client.'
[2017 Kan. S. Ct. R. 313.]

The disciplinary administrator argued that in the event the hearing panel concluded that L.A. was not the respondent's client and that CLS did not continue to be the respondent's

58

client following the July 29, 2013, email exchange, that KRPC 1.9 was applicable. The hearing panel agrees. Had the hearing panel concluded that CLS was the respondent's former client, then the hearing panel would have concluded that the respondent violated KRPC 1.9(c)(1). However, because the hearing panel concluded L.A. was the respondent's client and that CLS continued to be the respondent's client following the July 29, 2013, email exchange and, therefore, that the respondent violated KRPC 1.7 and KRPC 1.8, consideration of KRPC 1.9 is not supported by the facts. The respondent could not convert CLS from a 'current client' into a 'former client,' in order to fall within KRPC 1.9 instead of KRPC 1.7, merely by the unilateral (and failed) attempt to terminate the attorney-client relationship. *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449 (S.D.N.Y. 2000).

"KRPC 4.2

"116. KRPC 4.2 provides:

'In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.'

On September 24, 2013, the respondent sent an email message to L.A. and P.S. In that message, the respondent advised CLS, through L.A. and P.S. that CLS should not file for the protections of chapter 11 of the bankruptcy code. Based upon that correspondence, the hearing panel concludes that the respondent also violated KRPC 4.2. He communicated with a represented party (CLS) regarding the subject of the representation (whether or not to file bankruptcy) when the respondent knew the [*sic*] CLS was represented by Mr. Eron. The respondent did not have Mr. Eron's consent nor was he authorized to communicate with CLS by other law or court order. The respondent's violation of KRPC 4.2 was not incidental or insignificant. Rather, the respondent's violation of KRPC 4.2 was intentional. The respondent directly communicated with the principals of CLS advising them to ignore their attorney's specific advice. The respondent

59

argued that he did not violate KRPC 4.2 because in the September 24, 2013, letter, he stated that he was not providing legal advice. Just because the respondent states that what he is stating is not legal advice, does not make it so. Accordingly, the hearing panel concludes that the respondent intentionally violated KRPC 4.2.

"KRPC 8.4(g)

"117.　'It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law.' KRPC 8.4(g). The respondent violated KRPC 8.4(g) in a number of ways:  The respondent engaged in self-dealing at the expense of his clients—in both the ranch transaction and the attempted sale of CLS' assets. The respondent promised L.A. that he would make payroll and then did not without any notice to L.A. The respondent provided advice to P.S. regarding how he could get the company back from L.A. Finally, the respondent contacted Mr. Lazzo and asked whether the bank would foreclose on CLS' building and then sell the building to him. Because the respondent engaged in conduct that adversely reflects on his fitness to practice law, the hearing panel concludes that the respondent violated KRPC 8.4(g).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"118.　In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"119.　*Duty Violated*.  The respondent violated his duty to his client to refrain from engaging in conflicts of interest.

"120.　*Mental State*.  The respondent knowingly and intentionally violated his duty.

60

"121.   *Injury*.  The respondent intentionally exploited L.A. by attempting to purchase the [*sic*] CLS' assets and L.A.'s ranch at his substantial benefit and at CLS and L.A.'s substantial detriment. There were benefits which CLS could have received had it filed for protection under chapter 11 of the bankruptcy code in May or June, 2013. For example, the money generated by the sale of the ranch could have gone to creditors, including the IRS, sooner, thereby reducing L.A.'s personal liability. Those benefits were lost to CLS and L.A. based upon the respondent's actions. It is unknown whether CLS and L.A. would have reaped those benefits. However, the lost opportunity is an injury. Further, the ranch had a significantly greater value than the price the respondent paid for it. As such, the hearing panel concludes, that the respondent's misconduct caused L.A. potential serious injury.

"Aggravating and Mitigating Factors

"122.   Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

"123.   *Dishonest or Selfish Motive*.  The respondent's misconduct was motivated by selfishness. The respondent stood to gain financially as a result of his misconduct. Accordingly, the hearing panel concludes that the respondent's misconduct was motivated by selfishness.

"124.   *Multiple Offenses*.  The respondent committed multiple rule violations. The respondent violated KRPC 1.7, KRPC 1.8, KRPC 4.2, and KRPC 8.4. Accordingly, the hearing panel concludes that the respondent committed multiple offenses.

"125.   *Submission of False Evidence, False Statements, or Other Deceptive Practices During the Disciplinary Process*.  The respondent repeatedly testified that he did not provide CLS or L.A. with legal advice following the 'wrap-up' period. However, the record is replete with evidence that the respondent continued to provide CLS and L.A.

61

with legal advice continuing to September 24, 2013. The respondent's testimony otherwise is deceptive.

"126.   *Refusal to Acknowledge Wrongful Nature of Conduct*.  The respondent denied that his conduct violated the Kansas Rules of Professional Conduct. The respondent's refusal to acknowledge his wrongdoing is a factor in aggravation.

"127.   *Vulnerability of Victim*. While L.A. was an experienced businesswoman, she was not experienced in legal matters and relied to her detriment on the respondent. Thus, L.A. was vulnerable to the respondent's misconduct.

"128.   Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

"129.   *Absence of a Prior Disciplinary Record*.  The respondent has not previously been disciplined.

"130.   *Inexperience in the Practice of Law*.  The Kansas Supreme Court admitted the respondent to the practice of law in 2008. At the time the respondent engaged in the misconduct, the respondent had been practicing law for only 5 years. Thus, the respondent was inexperienced in the practice of law.

"131.   *Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney*. The respondent is an active and productive member of the bar of Wichita, Kansas. The respondent also enjoys the respect of his peers and generally possesses a good character and reputation as evidenced by several letters received by the hearing panel.

"132.   In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'4.31    Disbarment is generally appropriate when a lawyer, without the informed consent of client(s):

(a)    engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client; or

(b)    simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client; or

(c)    represents a client in a matter substantially related to a matter in which the interests of a present or former client are materially adverse, and knowingly uses information relating to the representation of a client with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client.'

"*Recommendation*

"133.    The disciplinary administrator recommended that the respondent be disbarred. The disciplinary administrator further recommend[s] that if the hearing panel is not inclined to recommend disbarment, the hearing panel should not recommend anything less than indefinite suspension. The respondent argued that he did not violate any provisions of the Kansas Rules of Professional Conduct, and thus should receive no discipline.

"134.    The respondent engaged in serious misconduct which included self-dealing. Further, during the disciplinary proceeding, the respondent was deceptive and he failed to take responsibility for the misconduct. Based upon the findings of fact, conclusions of law, and the Standards listed above, including the aggravating and

63

mitigating factors, the hearing panel unanimously recommends that the respondent be disbarred.

"135.  Costs are assessed against the respondent in an amount to be certified by the Office of the Disciplinary Administrator."

## DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the panel's findings, and the parties' arguments, and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see also Supreme Court Rule 211(f) (2017 Kan. S. Ct. R. 251) (a finding of misconduct must be established by clear and convincing evidence). "Clear and convincing evidence is 'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

*Exceptions to the panel's report*

Hodge filed exceptions to portions of the panel's final hearing report. See Supreme Court Rule 212(c)(2) (2017 Kan. S. Ct. R. 255). We address those first.

When a respondent does not take exception to a finding it is deemed admitted. *In re Woodring*, 289 Kan. 173, 174-75, 210 P.3d 120 (2009). But when an exception is taken, the panel's findings are not typically deemed admitted, so the court must determine whether the disputed findings are supported by clear and convincing evidence. *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008). In making this determination, the court does not weigh conflicting evidence, assess witness credibility, or redetermine

64

questions of fact. *In re Kline*, 298 Kan. 96, 113-14, 311 P.3d 321 (2013). If a disputed finding is supported by clear and convincing evidence, it will not be disturbed. *In re Mintz*, 298 Kan. 897, 902, 317 P.3d 756 (2014); *In re Frahm*, 291 Kan. 520, 525, 241 P.3d 1010 (2010).

Hodge enumerated 27 paragraphs of specific exceptions to the panel report and filed a brief and reply brief. His exceptions fall into two broader categories: (1) those relating to specific factual statements in the panel report and (2) disagreements with the panel's characterizations of the evidence, as well as the panel's conclusions and findings of rule violations.

As to the first category:

Exception ¶ 4: Hodge challenges the hearing panel's statement supporting a finding of mitigating circumstances that, at the time of the alleged misconduct, Hodge "had been practicing law for only five years." Final Hearing Report ¶ 130. Hodge argues the record reflects he had been practicing law "for *less than* five years." This is a distinction without a difference because this amounts to a mitigating factor either way. Hodge was admitted to practice in Kansas on September 26, 2008. The misconduct spanned from May 2013 through September 2013. We will note Hodge had been practicing law for *nearly* five years at the time of the misconduct.

Exception ¶ 12: Hodge challenges the hearing panel's statement that L.A. "entered into a written fee agreement with the respondent and paid the respondent $2,500 retainer for representation in the *Hadden* collection litigation." Final Hearing Report ¶ 19. Hodge correctly notes L.A. signed the agreement on CLS's behalf.

Exception ¶ 15: Hodge challenges the hearing panel's statement that "[t]he garnishment was nothing new. It had been in effect for months." Final Hearing Report ¶ 66. That paragraph describes a September 16, 2013, email from Hodge to L.A. Hodge maintains the panel's statement refers to a garnishment request directed to Yard Concerns that was filed September 6, 2013, so it could not have been in effect "for months." Hodge misreads the panel's findings because it refers to a garnishment against CLS. In fact, the panel quoted Hodge's email to L.A. that "'[t]he garnishment for CLS is still in effect.'" The panel is also correct that the garnishment against CLS was in effect for months. Plaintiff's Exhibit 127 contains a March 18, 2013, order of garnishment against CLS, which is nearly 6 months before Hodge's email.

Exception ¶ 24: Hodge asserts a due process violation, alleging the hearing panel "made a preliminary finding that a violation had occurred and discussed that finding while the merits phase of the hearing was ongoing and before Mr. Hodge had finished presenting his witnesses." When asked about this at oral argument because no further mention was made about it in Hodge's briefs, his counsel withdrew the exception.

As to the second category of exceptions, they are incorporated into Hodge's brief and reply where he raised separate but interrelated issues regarding: (1) the claimed attorney-client relationship with CLS and L.A.; (2) the alleged violations of KRPC 1.7 and 1.8 and the alternatively argued KRPC 1.9 violation; (3) the panel's finding of Hodge's KRPC 4.2 violation; (4) Hodge's fitness to practice law under KRPC 8.4(g); and (5) the panel's recommendation of disbarment. We will address his exceptions in context when deciding the panel's findings and conclusions, although not by specific paragraph numbers.

The panel found two violations of KRPC 1.7(a), which prohibits a lawyer from representing a client if the representation involves a concurrent conflict of interest. First, it found Hodge simultaneously represented his company, Yard Concerns, and CLS regarding Yard Concerns' purchase of CLS's assets. Second, the panel found Hodge simultaneously represented his company, Hodge Acquisitions, and L.A. regarding the purchase of L.A.'s ranch.

Based on those same dual representations, the panel also found Hodge violated KRPC 1.8(a), which prohibits a lawyer from entering into a business transaction with a client, and KRPC 1.8(b), which prohibits a lawyer from using information relating to representation of a client to the client's disadvantage without informed consent.

All of these violations are predicated on the existence of an attorney-client relationship. Hodge argues he did not engage in concurrent representations because he terminated his CLS representation before the attempted assets purchase. He also argues he never represented L.A.

In Kansas, an attorney-client relationship is not only determined by an express agreement between parties but may also be implied from their conduct.

> "'"The authority of an attorney begins with his retainer; but the relation of attorney and client is not dependent on the payment of a fee, nor is a formal contract necessary to create this relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the attorney are sought and received in matters pertinent to his profession."' [Citation

67

omitted.]" *Associated Wholesale Grocers, Inc. v. Americold Corp.*, 266 Kan. 1047, 1053, 975 P.2d 231 (1999).

"Whether a client-lawyer relationship exists for any specific purpose can depend on the circumstances and may be a question of fact." Supreme Court Rule 226, Scope, cmt. 17 (2017 Kan. S. Ct. R. 282-83). And an attorney-client relationship may exist even when an attorney did not intend one to exist or had explicitly disclaimed any attorney-client relationship. See, e.g., *In re Adoption of Irons*, 235 Kan. 540, Syl. ¶ 6, 548-49, 684 P.2d 332 (1984) (attorney for adoptive parents created an attorney-client relationship with child's natural mother when attorney offered legal advice when responding to her question despite attorney's explicit disclaimer of intent to enter such relationship). The attorney-client relationship may exist even when a prior contractual relationship ended. See *Alexander v. Russo*, 1 Kan. App. 2d 546, Syl. ¶ 2, 571 P.2d 350 (1977) ("The duty of fidelity and good faith imposed upon the attorney in dealing with his client . . . does not always cease immediately on the termination of the relation but continues as long as the influence created by that relationship continues to exist.").

(a) *Hodge represented CLS at the time of the attempted assets purchase.*

The hearing panel found Hodge "became attorney of record for CLS in the *Hadden* litigation in May 2013," and an attorney-client relationship with CLS continued despite the July 29, 2013, email exchange with L.A. (on behalf of CLS) purporting to end that attorney/client relationship. The panel pointed to four circumstances supporting its finding: (1) L.A. continued seeking legal advice from Hodge, and Hodge continued to provide it following the termination email exchange; (2) Hodge continued to influence L.A.'s decisions; (3) Hodge never withdrew as attorney of record in the *Hadden* collection litigation; and (4) after the termination email exchange, Hodge sent more than

68

20 emails to L.A. and others concerning CLS and the ranch using his attorney signature block.

Hodge primarily relies on the communications expressly terminating the attorney-client relationship between Hodge and CLS through L.A., the company's owner. He cites three cases for the proposition that an express termination of the attorney-client relationship controls: *Barragree v. Tri-County Electric Co-op., Inc.*, 263 Kan. 446, 950 P.2d 1351 (1997), *Gansert v. Corder*, 26 Kan. App. 2d 151, 980 P.2d 1032 (1999), and *Iowa Supreme Court Attorney Disciplinary Bd. v. Marks*, 814 N.W.2d 532 (Iowa 2012). And he insists any communication after the express termination was made to discuss nonlegal matters, i.e., the purchase of the company's assets, or to wrap up his representation of CLS in the *Hadden* litigation. These cases are of no benefit to him.

In *Barragree*, the court was tasked with determining whether there was an ongoing attorney-client relationship between certain plaintiffs and a law firm that would disqualify the firm from representing the defendant in that case. Hodge asserts the court held the plaintiffs' attorney-client relationship with the firm ended based on a written statement that the attorney assumed the client was "not relying upon this office to take any further action with regard to . . . matters" that the attorney had been handling before, and the client confirmed by return telephone call that they "'need[ed] no further services of the office in this connection.'" 263 Kan. at 451-52. But *Barragree* is not relevant because the court declined to decide whether the post-express termination conduct created an attorney-client relationship. 263 Kan. at 460.

*Gansert* was a legal malpractice action, and resolution turned on when an attorney-client relationship terminated. Hodge contends his circumstances are similar to *Gansert* because a Court of Appeals panel focused on a letter the client wrote to the lawyer stating the lawyer was "no longer representing [her] on this case." *Gansert*, 26

Kan. App. 2d at 152. But the court did not focus on a letter sent on April 25, 1995, as Hodge suggests; rather, it relied on the lawyer and client's meeting on April 24, 1995, when the client unequivocally fired the attorney. 26 Kan. App. 2d at 152, 156. The court held the parties' relationship ceased when the client's "actions and statements made clear that she terminated [the attorney's] representation on April 24, 1995, and from that point forward their relationship was adversarial," although the lawyer continued to be the attorney of record until the court approved his withdrawal as counsel. 26 Kan. App. 2d at 155. Put simply, the *Gansert* panel did not solely rely on the letter but instead considered the client's unambiguous conduct the day before the letter. This contrasts with Hodge's situation because there were no consistent actions or statements making clear the attorney-client relationship ended July 29, 2013, as Hodge claims.

As to *Marks*, Hodge misreads the decision to assert the court relied on the agreement between the parties in assessing whether an attorney-client relationship ceased. Rather, the *Marks* court held the relationship ended when a foreclosure action, in which the attorney was representing the client, formally ended with a court's judgment and the appeal time had run. 814 N.W.2d at 539. Although the court mentioned the written agreement clarified the termination, it was not the triggering event. The representation in the foreclosure action ended on December 29, 2005, and the written statement clarifying the termination was made on April 14, 2006. 814 N.W.2d at 539.

Here, Hodge's conduct after the termination email directly contradicted the purported statements that the representation ended. The hearing panel correctly reasoned Hodge's "actions speak louder than his words." Hodge provided advice like an attorney, identified himself as an attorney, and corresponded using his attorney signature block. It is not enough that Hodge denies acting in his capacity as an attorney because he says he was thinking and acting as a business person. Cf. *Colboch v. Morris Commc'ns Co., LLC*, No. 05-4143-SAC, 2007 WL 315804, at *14-15 (D. Kan. 2007) (rejecting plaintiff's

70

argument there was an attorney-client relationship with an attorney, who investigated harassment allegation against the plaintiff when the attorney was acting in capacity as human resources vice president because the attorney did not take any action that resembled legal advice or assistance).

Contrary to Hodge's exceptions, the record reveals he continued to act as an attorney by providing legal service to CLS despite the July 29, 2013, email exchange purporting to terminate the parties' relationship. First, Hodge never withdrew as attorney of record in the *Hadden* case, which is required when a client discharges the lawyer. See KRPC 1.16(a)(3) (2017 Kan. S. Ct. R. 331) (lawyer shall withdraw from representation when the lawyer is discharged).

Second, although Hodge characterizes his actions as "a few activities to 'wrap up' his representation of CLS in *Hadden*," those actions—e.g., advising L.A. to participate in a conference call with other attorneys regarding certain litigation; telling L.A. not to settle a specific case; requesting L.A. to provide him with some documents regarding the *Hadden* collection litigation; and preparing minutes of a special CLS board of directors and shareholders meeting—clearly exceeded KRPC 1.16(d) under which a discharged lawyer may take steps to the extent reasonably practicable to protect a client's interest upon termination of representation. See KRPC 1.16(d) (2017 Kan. S. Ct. R. 331) (a discharged lawyer may give "notice to the client," allow "time for employment of other counsel," surrender "papers and property to which the client is entitled," and refund "any advance payment of fee that has not been earned").

Third, although Hodge contends the post-July 29, 2013, communications between himself and CLS were merely related to the business matters to take over CLS's local business, his argument is not supported by the record. His assertion ignores the evidence showing communications and discussions between the parties were not practically or

substantively different before or after the July 29, 2013, email exchange. For instance, before the alleged termination, L.A. asked for—and Hodge provided—legal advice regarding CLS's financial matters. After the written termination, Hodge recommended L.A. sell the building that served as CLS's operational base. This advice did not relate to the parties' business deal.

We find clear and convincing evidence supports the panel's factual findings that Hodge and CLS had an ongoing attorney-client relationship even after they explicitly declared its termination.

(b) *Hodge had an attorney/client relationship with L.A.*

The hearing panel also concluded Hodge had an attorney-client relationship with L.A. concerning her ranch sale, since he (1) gave her legal advice regarding the ranch, (2) attended a meeting between L.A. and Michaud—trustee for the Michaud Family Trust, which held the mortgage on the ranch—to discuss the mortgage on the ranch, and (3) communicated with Michaud on L.A.'s behalf. See Final Hearing Report ¶ 102. Hodge claims he never represented L.A. personally and notes she hired other attorneys, namely Foulston Siefkin LLP, to represent her personally with the CLS assets sale, and later Grillot, a bankruptcy lawyer, when CLS filed for Chapter 11 bankruptcy protection and pursued her for CLS funds used in the initial ranch purchase.

But while arguing this broadly, Hodge does not specifically address whether an implied attorney-client relationship existed with L.A. regarding the ranch. See Respondent's Exceptions to the Final Hearing Report ¶¶ 2 and 3. Hodge generally took exceptions to the panel's conclusion that "he entered into an implied attorney-client relationship with . . . L.A. in her personal capacity" but did not take exceptions to the determination, i.e., Hodge admitted, that he gave legal advice to L.A. about the ranch,

72

and, of course, it is undisputed he met with Michaud to discuss the ranch's mortgage, as well as corresponded with Michaud on L.A.'s behalf.

Exceptions to a final hearing report that are not supported in a respondent's appellate brief by argument or citation to the record are deemed abandoned. *In re Bishop*, 285 Kan. 1097, 1106, 179 P.3d 1096 (2008). Hodge never took exception to the panel's factual findings supporting its conclusion that he represented L.A. personally for the ranch sale. And when this was pointed out by the Disciplinary Administrator, Hodge responded in his reply brief only that he did not abandon the issue, arguing simply that he "'*never* represented'" her, "so he did not represent her with respect to the ranch."

But the undisputed facts in this regard are bolstered by the panel's determinations about witness credibility. For example, the panel found "L.A. believed . . . [Hodge] was her attorney as to CLS matters as well as her attorney regarding her problems with paying the mortgage on the ranch." Final Hearing Report, ¶ 27. This court refrains from weighing conflicting evidence, assessing witness credibility, or redetermining questions of fact. *In re Kline*, 298 Kan. at 113-14; *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

Even setting aside the preservation question, clear and convincing evidence in the record supports the panel's conclusion Hodge represented L.A. concerning the ranch transaction. Having agreed with the panel that Hodge represented CLS and L.A. during the relevant times, we consider next the rule violations associated with that representation.

*KRPC 1.7(a)(1) and (2)*

The hearing panel concluded Hodge violated KRPC 1.7(a)(1) and (2) in both the assets sale with CLS and the ranch sale with L.A. It found a concurrent conflict of interest when Hodge "sought to obtain the assets of CLS on favorable terms to Yard Concerns," because "L.A. had an interest in selling [them] at the highest possible price." It further noted a substantial risk existed in that his "representation of CLS would be materially limited by [Hodge's] responsibilities to Yard Concerns, as well as by a personal interest of the respondent as the sole owner of Yard Concerns." See KRPC 1.7(a)(2); KRPC 1.7, cmt. 7 (2017 Kan. S. Ct. R. 301) ("Directly adverse conflicts can also arise in transactional matters. For example, if a lawyer is asked to represent the seller of a business in negotiations with a buyer represented by the lawyer . . . ."); see also *State v. Callahan*, 232 Kan. 136, 139-40 652 P.2d 708 (1982) (holding a conflict of interest when a lawyer represented both sellers and purchaser in land sale transaction). And the panel found Hodge did not obtain the required informed consent under KRPC 1.7(b).

With regard to the 1.7 violations concerning the CLS assets sale, Hodge does not specifically challenge the panel's findings that he had a conflict of interest under KRPC 1.7. Instead, he asserts he obtained informed consent from CLS.

Rule 1.7(b) permits a lawyer to represent a client despite a concurrent conflict of interest if certain exceptions are met, including the lawyer obtains the client's informed consent in writing. The informed consent required by KRPC 1.7(b)(4) is defined in KRPC 1.0(f) (2017 Kan. S. Ct. R. 284) as:

> "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct."

74

The panel determined Hodge failed to obtain informed consent from CLS as required under KRPC 1.7(b) and KRPC 1.0(f) because he did not adequately inform CLS of the material risks and alternatives to selling its assets to Yard Concerns. For instance, the panel noted Hodge did not inform L.A. "of the benefits of filing for the protections under chapter 11 of the bankruptcy code" and "the risk that Equity Bank would call the note on the building," if CLS's assets were sold.

Hodge points to three documents to support his position that he obtained informed consent: (1) the July 29, 2013, email, (2) the waiver language in Yard Concerns' formal offer for the purchase of assets, and (3) the waiver in the corporate minutes. But regardless of the language used in those documents, none provide the informed consent required by KRPC 1.0(f). For example, the July 29, 2013, email that disclosed he was a member of Yard Concerns and had some knowledge of CLS's financial matters, did not explain "material risks" nor did it provide "reasonably available alternatives to the proposed course of conduct." KRPC 1.0(f) (2017 Kan. S. Ct. R. 284). The other writings fail to qualify as informed consent for the same reason.

Without the informed consent mandated in KRPC 1.7(b) as an exception to the general prohibition under KRPC 1.7(a), the panel's conclusion that Hodge violated KRPC 1.7(a)(1) and (2) when representing Yard Concerns and CLS simultaneously in the CLS assets sale is supported by clear and convincing evidence.

As to the ranch sale, the panel concluded Hodge simultaneously represented Hodge Acquisitions, a buyer, and L.A., a seller. The panel determined this simultaneous representation violated KRPC 1.7(a) because Hodge was Hodge Acquisitions' sole owner, who had a personal interest in purchasing the ranch "at the lowest possible price," and "L.A. had an interest in selling the property at the highest possible price." The panel

75

further concluded this KRPC 1.7(a) violation could not be excused because Hodge failed to obtain informed consent as required under KRPC 1.7(b) and KRPC 1.0(f).

In his opening and reply briefs, Hodge fails to challenge the panel's conclusion of the directly adverse representation of CLS and Hodge Acquisitions and its finding of lack of informed consent. Instead, he simply repeats he never had an attorney-client relationship with L.A. But as discussed above, clear and convincing evidence supports the panel's finding that he did. And as the Disciplinary Administrator correctly points out, "there was no writing that even purports to serve as 'informed consent'" as to the sale of the ranch. See KRPC 1.7(b)(4) (2017 Kan. S. Ct. R. 300) ("[e]ach affected client gives informed consent, *confirmed in writing*").

Clear and convincing evidence supports the panel's conclusions that L.A. did not give the informed consent required by KRPC 1.7(b) and that Hodge violated KRPC 1.7(a) when simultaneously representing Hodge Acquisitions and L.A. in the ranch sale.

*KRPC 1.8(a) violations*

The hearing panel determined Hodge violated KRPC 1.8(a) in both the assets sale with CLS and the ranch sale with L.A. KRPC 1.8(a) prohibits business transactions between a lawyer and a client unless certain conditions are met. The panel concluded Hodge violated KRPC 1.8(a) by entering into the business transaction with CLS for the sale of the company's assets and by failing to comply with three conditions that must be satisfied to avoid a KRPC 1.8(a) violation. The panel found: (1) the agreement's terms were unfair and unreasonable to CLS; (2) CLS was not "given a reasonable opportunity to seek the advice of independent legal counsel on the transaction;" and (3) Hodge did not obtain CLS's informed consent. See KRPC 1.8(a)(1)-(3) (2017 Kan. S. Ct. R. 307).

76

In his hearing brief before the panel, Hodge argued he did not violate KRPC 1.8(a) because there was no attorney-client relationship between himself and CLS. He never objected at the hearing to the business transaction's existence. In fact, Hodge conceded, "[T]he business transaction entered into was by and between Yard Concerns . . . and [CLS]." Before this court, Hodge now insists he did not enter into a business transaction. He claims "[t]he offer was rescinded before the parties had drafted, reviewed, or exchanged the 'transfer and sale documents required for the consummation of the transaction.'" In his reply brief, Hodge claims he preserved this question with the panel by broadly objecting to the KRPC 1.8(a) allegation.

Hodge admitted in his hearing brief there was a business transaction, so its existence was not argued by the parties or determined by the panel. If a respondent fails to challenge an issue before a hearing panel, the issue is waived. *In re Gershater*, 270 Kan. 620, 627-28, 17 P.3d 929 (2001) (respondent waived objection to evidence's use and any attorney-client privilege because not challenged at hearing); *In re Roth*, 269 Kan. 399, 408, 7 P.3d 241 (2000) (mediation-related privilege waived when it was not asserted at discipline hearing).

Even so, the failure to complete the transfer and sale documentation required to consummate the transaction would not be fatal as Hodge claims now. In Kansas, documentation is not necessary for KRPC 1.8(a) purposes. See *In re Davidson*, 285 Kan. 798, 804, 175 P.3d 855 (2008) (respondent and client entered into business transaction, even though "the transaction and terms were not transmitted in writing," and although it was "impossible to determine whether the terms were fair and reasonable to the client"); see also *Quinton v. Mulvane*, 71 Kan. 687, 690-91, 81 P. 486 (1905). This argument has no merit.

77

Hodge's next assertion is that he could not have violated KRPC 1.8(a) because there was time remaining to obtain informed consent. This assumes he did not enter into a business transaction since there was no documentation and he later cancelled the contract. But, as discussed, CLS accepted Hodge's offer the day after it was received. And as correctly noted by the Disciplinary Administrator, "What good is informed consent and advice to have independent counsel review the transaction if the agreement is already accepted and signed?" Hodge's argument is unconvincing.

Regardless, clear and convincing evidence supports a finding that Hodge entered into a business transaction with CLS. On August 21, 2013, Yard Concerns made a formal offer to purchase CLS's assets. The following day, CLS accepted that offer. And in September 2013, when Hodge informed CLS's bankruptcy attorney that Yard Concerns "revoked" its offer, Yard Concerns had already taken possession of assets and was collecting accounts receivables.

The next question is whether Hodge complied with KRPC 1.8(a)(1)-(3). The panel determined: (1) "the terms on which [Hodge] acquired the interest were not fair and reasonable to CLS"; (2) "while [Hodge] gave 'lip service' to advising CLS of the desirability of seeking . . . the advice of independent legal counsel on the transaction," CLS did not have a "reasonable opportunity to do so," and he knew that CLS had no funds to seek and did not provide CLS "with a sufficient period of time to seek the advice of independent legal counsel"; and (3) Hodge did not obtain informed consent.

As to KRPC 1.8(a)(1), Hodge asserts the money he offered to buy CLS's assets ($318,273.10) was not unfair or unreasonable because there was no evidence CLS's assets were worth more than that. But the panel did not ground its conclusion on the purchase price. Instead, it looked to the adverse effects resulting from the transaction in that the "original deal . . . would leave [P.S.] and [L.A.] on the hook for the entirety of the

78

unpaid taxes." And as the Disciplinary Administrator noted, "the asset sale triggered default on CLS's business property mortgage with Equity Bank [and] garnishments from existing judgments would have seized any monies CLS received under the agreement."

The panel's conclusion is supported by the clear and convincing evidence detailed in the record. Hodge's assertion has no merit.

Concerning KRPC 1.8(a)(2), Hodge claims CLS was "at least a month away from finalizing the 'transfer and sale documents' . . . for the consummation of the transaction" and therefore insists CLS had a reasonable opportunity to seek independent legal advice. But Hodge failed to satisfy KRPC 1.8(a)(2) for two reasons.

First, under KRPC 1.8(a)(2), a lawyer must advise a client in writing about the desirability of seeking independent legal advice. The only writing Hodge provided to CLS was a single sentence in his August 22, 2013, email: "You are advised to seek legal counsel when this is discussed and before it is signed." This wholly fails to advise CLS about the desirability of obtaining independent legal counsel as required under KRPC 1.8(a)(2). See *In re Disciplinary Action Against Giese*, 662 N.W.2d 250, 257 (N.D. 2003) ("The attorney must take precautions to ensure the client is fully aware of the details and risks of the transaction, and a passing suggestion to consult a second attorney does not discharge an attorney's obligation" under North Dakota Rule of Professional Conduct 1.8).

Second, under KRPC 1.8(a)(2), a client must be given a reasonable opportunity to seek independent counsel's legal advice. But as found by the panel, Hodge knew CLS did not have a reasonable chance to do so. Clear and convincing evidence supports this determination. Furthermore, Hodge gave CLS two business days to decide if CLS wanted to accept or reject his assets sale offer, and his formal offer specifically stated, "If this

offer is not accepted as of 5:00 p.m. on Friday, August 23, 2013, the same will be deemed rejected." Because Hodge set this deadline, he knew he had not provided CLS with sufficient time to seek independent legal counsel.

Finally, as discussed earlier, Hodge did not obtain informed consent from CLS. Accordingly, clear and convincing evidence supports the panel's findings that Hodge did not satisfy the three conditions required under KRPC 1.8(a)(1)-(3) for the CLS transaction.

Next we consider the KRPC 1.8(a) violation for the ranch transaction. The panel concluded Hodge "violated KRPC 1.8(a) when he entered into a business transaction with L.A. for the sale of the ranch." It further noted, he failed to comply with the three requirements in KRPC 1.8(a)(1)-(3).

First, the panel found the transaction was unfair and unreasonable because Hodge paid "approximately one-fourth the price that L.A. and P.S. paid the Michaud Family Trust," and the property was "appraised at more than $1 million." Second, the panel noted Hodge only suggested L.A. seek independent legal counsel on the ranch sale but that L.A. was not given a reasonable opportunity to do so. Finally, the panel concluded there was no informed consent from L.A.

Hodge did not challenge the panel's conclusion of his violation of KRPC 1.8(a) regarding the ranch sale with L.A., other than his assertion of the lack of an attorney-client relationship, which has been decided against him. With that notation, this issue may be deemed abandoned. See *In re Bishop*, 285 Kan. at 1106. Nevertheless, clear and convincing evidence supports the panel's findings and conclusions in this regard.

80

*KRPC 1.8(b) violations*

KRPC 1.8(b) (2017 Kan. S. Ct. R. 307) prohibits the use of "information relating to representation of a client to the disadvantage of the client unless the client gives informed consent." The panel determined Hodge used information he learned during the representation of CLS and L.A. regarding their financial situations to their disadvantage. It noted, "Neither CLS nor L.A. gave informed consent to the use of the information in that manner."

Hodge does not challenge the panel's conclusion that he used the financial information to the clients' disadvantage. Instead, and as already discussed, he defends by arguing the lack of an attorney-client relationship, which has been decided against him. Accordingly, the remainder of this KRPC 1.8 issue is deemed abandoned. *In re Bishop*, 285 Kan. at 1106.

*KRPC 4.2 violations*

KRPC 4.2 (2017 Kan. S. Ct. R. 353) prohibits a lawyer from communicating "about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer . . . ."

The panel found that after Hodge learned of L.A.'s intent to have CLS file chapter 11 bankruptcy, he sent an email to her advising that "CLS should not file for the protections of chapter 11 of the bankruptcy code." Instead, Hodge encouraged L.A. to continue with the assets sale to Yard Concerns as previously planned. The panel, based on this correspondence, concluded Hodge violated KRPC 4.2.

Hodge was an attorney for Yard Concerns and communicated with a represented party (CLS) via its owner L.A. regarding the subject of the representation—whether to file bankruptcy instead of proceeding with the assets sale—while Hodge knew CLS was represented by Eron for that subject matter. The panel further noted Hodge's KRPC 4.2 violation was done intentionally to influence CLS's decision by advising it to ignore Eron's legal advice to file a chapter 11 bankruptcy. In short, Hodge was trying to get L.A. to sell CLS's assets to Yard Concerns instead of filing bankruptcy.

Hodge's argument is that he was not representing a client because he was acting in his personal capacity as a potential buyer when he sent the email to L.A. He cites *Pinsky v. Statewide Grievance Committee*, 216 Conn. 228, 236, 578 A.2d 1075 (1990), as support, but it is distinguishable. In *Pinsky*, an attorney-litigant who was represented by counsel sent a letter to the opposing party, who was also represented by counsel. In the letter, he "expressed his frustration with the events surrounding the [subject matter], and threatened to initiate a legal action against" the opposing party. 216 Conn. at 230. The Connecticut Supreme Court held Pinsky did not violate Rule 4.2 of the Connecticut Rules of Professional Conduct because it said his "letter was a communication between litigants." 216 Conn. at 236. But unlike *Pinsky*, Hodge was not represented by another counsel; rather, he was the lawyer representing Yard Concerns (or himself as Yard Concerns' owner).

KRPC 4.2, cmt. 1 (2017 Kan. S. Ct. R. 353-54) states:

> "This Rule contributes to the proper functioning of the legal system by protecting a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship and the uncounseled disclosure of information relating to the representation."

82

As noted by the Disciplinary Administrator, the instant case "illustrates why this rule exists." Hodge used his specialized legal knowledge to attempt to interfere with the Eron/CLS attorney-client relationship for his benefit. See *In re Disciplinary Action Against Lucas*, 789 N.W.2d 73, 76-77 (N.D. 2010) (holding pro se attorney violated Rule 4.2 of the North Dakota Rules of Professional Conduct when sending a letter to represented opposing party to discuss subject matter of the controversy); *In re Disciplinary Proceeding Against Haley*, 156 Wash. 2d 324, 338, 126 P.3d 1262 (2006) ("[W]e hold that a lawyer acting pro se is 'representing a client' for purposes of [Rule] 4.2[a]."); *In re Discipline of Schaefer*, 117 Nev. 496, 508, 25 P.3d 191 (2001) (noting when lawyers appear pro se, they still have an "advantage over the average layperson, and the integrity of the relationship between the represented person and counsel is not entitled to less protection merely because the lawyer is appearing pro se," and discussing caselaw holding ABA Model Rule 4.2 applies to "a pro se lawyer [who] makes direct contact with a represented party").

While Hodge claims he was acting as a potential assets buyer and, therefore, not representing a client when sending the email to L.A., the record shows he was representing himself and Yard Concerns as found by the panel. In doing so, he offered his specialized legal advice to L.A. on a complex matter all the while insisting he was "not giving legal advice." Clear and convincing evidence supports the panel's conclusion that Hodge violated KRPC 4.2.

*KRPC 8.4(g) violations*

KRPC 8.4(g) (2017 Kan. S. Ct. R. 379) states, "It is professional misconduct for a lawyer to . . . engage in any other conduct that adversely reflects on the lawyer's fitness to practice law." The panel concluded Hodge violated KRPC 8.4(g) in four ways:

83

(1) engaging in self-dealing at the expense of his clients—in both the ranch transaction and the attempted sale of CLS assets; (2) promising L.A. he would make the CLS payroll and then not doing so without notice to L.A.; (3) providing advice to P.S. regarding how he could get the company back from L.A.; and (4) contacting Lazzo, the Equity Bank attorney, and asking whether the bank would foreclose on CLS's building and then sell the building to him.

At the outset, Hodge claims the disciplinary complaint never alleged he violated Rule 8.4(g) by (1) promising or failing to make payroll; (2) communicating with P.S. about his getting the company back; or (3) communicating with the bank's lawyer. Because of this, Hodge insists he did not have a meaningful opportunity to defend himself against those allegations. In response, the Disciplinary Administrator concedes these three facts were not stated in the complaint but contends the basic factual outline of Hodge's representation of CLS, the proposed assets purchase deal, the acceptance of the offer by L.A., the role of Equity Bank and the real estate, the breakdown of the deal, and the email to L.A. were sufficient for due process purposes.

Supreme Court Rule 211(b) (2017 Kan. S. Ct. R. 251) requires a complaint to be sufficiently clear and specific to inform the respondent of the alleged misconduct. In disciplinary proceedings, a lawyer "is entitled to procedural due process, and that due process includes notice of the nature of the charges sufficient to inform and provide a meaningful opportunity for explanation and defense." *In re Matney*, 241 Kan. 783, 790, 740 P.2d 598 (1987). But "it is not necessary for the board to notify the respondent of specific acts of misconduct as long as the complaint sets out the basic factual situation from which the charges might result, thereby putting the respondent on notice as to what ethical violations may arise therefrom." 241 Kan. at 790; see also *State v. Caenen*, 235 Kan. 451, 459, 681 P.2d 639 (1984) (same).

84

In *In re Roth*, 269 Kan. 399, 404, 7 P.3d 241 (2000), we explained:

"'[T]he Disciplinary Administrator need not set forth in the complaint the specific disciplinary rules allegedly violated nor plead specific allegations of misconduct. Instead, the question is whether the facts set out in the complaint in connection with the charge put respondent on notice as to what ethical violations may arise therefrom. [Citation omitted.] It is not incumbent on the Disciplinary Administrator to notify respondent of charges of specific acts of misconduct *as long as proper notice is given of the basic factual situation out of which the charges might result*.'" (Emphasis added.)

Although the three listed facts were not specifically stated in the complaint, the Disciplinary Administrator provided a 76-page timeline setting out in chronological order most of the relevant facts drawn from the exhibits and offered that timeline as an attachment to its Corrected Trial Brief well before the hearing. That timeline clearly contains the text messages about the promise to make payroll and L.A.'s email after Hodge failed to do so, Hodge's email to P.S., and his email to Lazzo about Equity Bank. These are all communications authored or received by Hodge, so he knew they existed.

Importantly, Hodge does not explain what additional evidence or testimony he could have introduced at the hearing to counter, or put into a more favorable context, the written record that comprises these facts. This strongly suggests Hodge was not disadvantaged by the lack of notice he now complains of. In addition, we note Hodge stipulated to the admission of the exhibits containing these facts. And we further note these subjects were discussed without objection from Hodge during the five days of hearings that were spread out over several months. See *In re Gershater*, 270 Kan. 620, 627-28, 17 P.3d 929 (2001) (attorney waived challenge to use of certain evidence by failing to object to its introduction before the panel).

We hold Hodge had meaningful notice of the evidence forming the basis of the KRPC 8.4(g) violations he was facing and were found by the panel. See *In re Kline*, 298 Kan. at 117 ("Any licensed Kansas attorney reasonably observing the Rules of Professional Conduct would be on notice of a potential for violation of the rules alleged to have been violated under the facts as alleged.").

Moving on to the panel's findings and conclusions regarding KRPC 8.4(g), Hodge claims his "purported violation of conflict rules" is properly addressed under Rules 1.7 and 1.8 and cannot also constitute a Rule 8.4(g) violation. He cites *In re Kershner*, 250 Kan. 383, 388, 827 P.2d 1189 (1992), and *In re Rausch*, 272 Kan. 308, 326, 32 P.3d 1181 (2001). But Hodge misreads these cases.

In *Kershner*, respondent was convicted of four felony Kansas Securities Act violations, and the court held those felony convictions were sufficient to show a Model Rule of Professional Conduct 8.4(b) violation. 250 Kan. at 388 ("'It is professional misconduct for a lawyer to . . . commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects.'"). The *Kershner* court further noted, because there was a violation under Rule 8.4(b), the respondent's "felony convictions cannot also be 'other conduct that adversely reflects on his fitness to practice law'" and constitute a violation under Rule 8.4(g). *Kershner*, 250 Kan. at 388.

In *Rausch*, a hearing panel found a respondent violated KRPC 8.4(b) through (d) and (g) based upon a civil judgment and criminal convictions. Rausch asserted that under *Kershner* his convictions could not also be "'other conduct'" under KRPC 8.4(g) when they were sufficient to show a KRPC 8.4(b) violation. But the court held *Kershner* did not support an argument that an attorney could never be found in violation of both 8.4(b) and 8.4(g). Instead, the *Rausch* court said that based on the specific facts, in which Rausch's convictions formed the basis for the alleged 8.4(b) and 8.4(g) violations, Rausch

86

could not be in violation of both subsections (b) and (g). *Rausch*, 272 Kan. at 326. In sum, neither case governs Hodge's case.

The Disciplinary Administrator argues that because "'fitness to practice law' is not an element of any of the conflicts violations" under KRPC 1.7 and KRPC 1.8, Hodge's KRPC 8.4(g) violation should not be considered as "multiplicity," citing *State v. Pribble*, 304 Kan. 824, 826, 375 P.3d 966 (2016) (multiplicity is "the charging of a single offense in several counts of a complaint or information"). This argument is convincing.

When a lawyer's conduct constitutes a conflict of interest with a client, it is a violation of KRPC 1.7 and KRPC 1.8 upon satisfaction of all the required elements enumerated in the rules. But KRPC 8.4(g) (2017 Kan. S. Ct. R. 379) proscribes an attorney's "conduct that adversely reflects on the lawyer's fitness to practice law." The conduct at issue in the current case—Hodge's concurrent conflict—was intentional, exploitive, and manipulative in that he tried to influence his clients' decisions to advantage himself, i.e., self-dealing. This surely reflects adversely on his fitness to practice law.

As to the remaining conduct the panel determined constituted a KRPC 8.4(g) violation, Hodge's primary argument is that none were so "egregious" as to rise to a violation. But this relies on an inaccurate presumption that Rule 8.4(g) is reserved for criminal or quasi-criminal conduct relevant to law practice. Hodge quotes KRPC 8.4, cmt. 2 (2017 Kan. S. Ct. R. 380):

> "Although a lawyer is personally answerable to the entire criminal law, a lawyer should be professionally answerable only for offenses that indicate lack of those characteristics relevant to law practice. Offenses involving violence, dishonesty, or breach of trust, or

87

serious interference with the administration of justice are in that category. A pattern of repeated offenses, even ones of minor significance when considered separately, can indicate indifference to legal obligation."

The comment concerns a "criminal act" under KRPC 8.4(b)—not what would constitute "any other conduct" under KRPC 8.4(g). Nothing in the rule requires "other conduct" to be equivalent to criminal or quasi-criminal conduct. Rather, it simply states "any other conduct that adversely reflects on the lawyer's fitness to practice law." KRPC 8.4(g) (2017 Kan. S. Ct. R. 379). But Hodge insists KRPC 8.4(g) applies only to "egregious wrongdoing that seriously erodes confidence in an attorney's professional character," apparently trying to equate his characterization of "egregious wrongdoing" with criminal or quasi-criminal conduct. KRPC 8.4(g) has no such requirement.

Taken in context with the other facts and in conjunction with his self-dealing and duplicitous roles, we hold that clear and convincing evidence supports the panel's finding. The evidence reflects L.A. was desperately relying on Hodge's promise to cover payroll and he was already collecting CLS's receivables. He claimed the garnishments prevented him from fulfilling his promise, but he knew of them at the time he made the promise. His conduct also appears retaliatory when it was obvious the assets purchase agreement was not going to close.

Next, the panel concluded Hodge's email to P.S. violated KRPC 8.4(g). The email stated:

> "I believe she is going to try and file very quickly. If you want to take the company back you will have to follow the processes in your buy/sell agreement. I think a right to cure notice has to be sent and you may have to give her 30 days to respond.

"Did she ever tell you that she is broke and CLS is broke?"

As correctly noted by the Disciplinary Administrator, the email shows Hodge's efforts to go through P.S. to take control of CLS when he discovered L.A. was pursuing the corporate bankruptcy, which would preclude Hodge's assets purchase. This reflects an effort to undermine his client. And it is obvious Hodge revealed confidential information he gained in his representation of CLS and L.A.

The last finding concerns the panel's conclusion that Hodge violated Rule 8.4(g) by asking Equity Bank's lawyer "whether the bank would foreclose on CLS' building and then sell [it] to him." As accurately noted by the Disciplinary Administrator, Hodge knew the building's debt was about $300,000 while the actual value was around $800,000. In addition, it was the business transaction Hodge initiated with CLS that triggered the bank's decision to foreclose the building.

These facts are essentially undisputed. They demonstrate clear and convincing evidence supporting the panel's finding that Hodge violated KRPC 8.4(g).

DISCIPLINE

Having found clear and convincing evidence that Hodge violated the Kansas Rules of Professional Conduct, all that remains is the task of imposing discipline. The violations are KRPC 1.7 (2017 Kan. S. Ct. R. 300) (conflict of interest); 1.8(a) (2017 Kan. S. Ct. R. 307) (conflict of interest involving a business transaction), and 1.8(b) (using information to the disadvantage of the client); 4.2 (2017 Kan. S. Ct. R. 353) (communication with person represented by counsel); and 8.4(g) (2017 Kan. S. Ct. R. 379) (engaging in conduct adversely reflecting on lawyer's fitness to practice law).

89

The panel recommended disbarment, and so does the Disciplinary Administrator. Hodge, while denying any violations, argues if the court disagrees with him that at most we should impose an "admonition." In any given case, this court is not bound by the recommendations from the hearing panel or the Disciplinary Administrator. Supreme Court Rule 212(f) (2017 Kan. S. Ct. R. 255); see also *In re Mintz*, 298 Kan. 897, 911-12, 317 P.3d 756 (2014). "Each disciplinary sanction is based on the specific facts and circumstances of the violations and the aggravating and mitigating circumstances presented in the case." *Mintz*, 298 Kan. at 912. "Because each case is unique, past sanctions provide little guidance." *In re Bishop*, 285 Kan. at 1108.

To aid in determining an appropriate sanction, the court generally considers the American Bar Association Standards for Imposing Lawyer Sanctions. *Mintz*, 298 Kan. at 912. Like the panel, we choose to utilize the ABA's framework to assist us with the task of determining the appropriate discipline.

Under the ABA framework, we consider four factors in determining punishment: (1) the ethical duty violated by the lawyer; (2) the lawyer's mental state; (3) the actual or potential injury resulting from the lawyer's misconduct; and (4) the existence of aggravating or mitigating factors. *Mintz*, 298 Kan. at 912; see also *In re Rumsey*, 276 Kan. 65, 78, 71 P.3d 1150 (2003) (listing four components of ABA Standards' framework); ABA Standard 3.0.

(1) *Hodge violated numerous ethical duties to his clients.*

Hodge owed a duty to refrain from engaging in conflicts of interest, and violated that duty when he entered into the business transactions for the CLS assets and ranch purchase. Throughout these transactions, Hodge's self-interests were directly adverse to

those of CLS and L.A. and the record is replete with examples in which Hodge acted for himself and not his clients.

(2) *Hodge acted knowingly in violating multiple rules of professional conduct.*

The hearing panel concluded Hodge knowingly and intentionally violated his duty. Hodge asserts his "conduct was, at worst, negligent." Hodge cites three out-of-state cases for the proposition that an attorney must be aware that the conduct violates the rules for the conduct to be "knowingly." He cites: *In re Non-Member of State Bar, Van Dox*, 214 Ariz. 300, 305, 152 P.3d 1183 (2007) ("[A] respondent knowingly engages in the unauthorized practice of law only if she is aware that her conduct constitutes the unauthorized practice of law."); *In re White-Steiner*, 219 Ariz. 323, 326, 198 P.3d 1195 (2009); and *Discipline of Stansfield*, 164 Wash. 2d 108, 128, 187 P.3d 254 (2008). None are applicable.

In attorney disciplinary proceedings, Kansas courts follow the ABA Standards' definition of the term "knowingly," which is different than the cases Hodge mentions. In *In re Lober*, 276 Kan. 633, 639, 78 P.3d 442 (2003), this court defined "knowingly" as: "'1. Having or showing awareness or understanding; well-informed . . . . 2. Deliberate; conscious.'" See also ABA, Annotated Standard for Imposing Lawyer Sanctions, at xxi (2015) ("'Knowledge' is the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result."). This definition does not require a lawyer to believe his or her conduct violates the rules for that conduct to be done knowingly.

(3) *Hodge's violations resulted in actual and potential injury.*

The panel found Hodge "intentionally exploited" his clients to "his substantial benefit" and at the clients' "substantial detriment." It further noted, "There were benefits which CLS could have received had it filed for protection under chapter 11 of the bankruptcy code in May or June, 2013," and listed several examples of those benefits—i.e., "the money generated by the sale of the ranch could have gone to creditors, including the IRS, sooner, thereby reducing L.A.'s personal liability." The panel characterized those benefits as the clients' "lost opportunity," which "is an injury."

Hodge claims potential injury must be "reasonably foreseeable" and the probable result of the lawyer's misconduct. He argues that because the panel conceded it was "unknown" whether the clients would have reaped the identified benefits, any lost opportunity should not be considered an injury.

Clear and convincing evidence in the record supports the panel's finding that Hodge's conduct caused serious injury and potentially serious injury. Two experienced bankruptcy lawyers testified at the hearing about the lost opportunities to CLS of bankruptcy code protections, even if bankruptcy itself was unavoidable. Those included the ability to operate without interference from creditors, temporarily putting aside all debts to try to clean up its business problems, and stopping all adverse debt activity such as garnishments, assessments, lawsuits, and pending litigation, as well as modifications to payments owed secured creditors. Just as importantly, proof of monetary injury to a client is unnecessary in the disciplinary context. See *In re Kline*, 298 Kan. 96, 218-19, 311 P.3d 321 (2013).

92

(4) *The existence of aggravating and mitigating circumstances*

This court's rules require a disciplinary panel explain "[m]itigating or aggravating circumstances which affect the nature or degree of discipline." Supreme Court Rule 211(f) (2017 Kan. S. Ct. R. 252). The panel must consider the evidence presented as to aggravating and mitigating circumstances and determine the weight to be assigned to each in arriving at an appropriate discipline. *In re Walsh*, 286 Kan. 235, 248, 182 P.3d 1218 (2008).

*Aggravating factors*

The panel found five aggravating factors: (1) Hodge's KRPC violations were motivated by selfishness; (2) Hodge committed multiple offenses; (3) he repeatedly testified he did not offer the clients legal advice after a "wrap-up" period; (4) he denied the wrongful nature of his conduct; and (5) L.A. was a vulnerable victim in that "she was not experienced in legal matters and relied to her detriment on" Hodge.

As to the first factor, Hodge acknowledges his actions were motivated by self-interest by arguing he was acting in his individual business capacity—rather than an attorney-client relationship. A review of the record readily shows clear and convincing evidence to support this aggravating factor. Hodge sought to benefit himself by acquiring assets worth more than he was going to pay for them from parties who were in financial distress and needed help with the circumstances they found themselves in.

As to the second factor, our conclusions already demonstrate multiple offenses over the course of conduct in this case. Clear and convincing evidence supports the panel's conclusion.

As to the third factor, Hodge claims he never denied any of the communication with his clients, but again whether he denied the existence of the communication with the two clients was not a question at the hearing. The panel correctly found he made false statements when he insisted he never provided legal advice when he actually did.

With regard to the fourth factor, Hodge claims he did not refuse to acknowledge the wrongful nature of his conduct; rather he advanced "[g]ood-faith disagreement over novel legal issues." But the record shows otherwise. Hodge did not simply zealously challenge the Disciplinary Administrator's allegations or the panel's negative findings. His tactics demonstrated an inability or refusal to acknowledge the strength of the evidence against him, as well as the number and significance of the violations presented. See *In re Kline*, 298 Kan. at 229. The panel correctly found as an aggravating factor Hodge's refusal to acknowledge his wrongdoing.

Finally, he argues L.A. was not a vulnerable victim because "she had a lengthy history of working with lawyers on various legal matters." Specifically, the panel found, "While L.A. was an experienced businesswoman, she was not experienced in legal matters and relied to her detriment on the respondent. Thus, L.A. was vulnerable to the respondent's misconduct." This court previously has ruled a victim's inexperience with legal matters alone is not sufficient for a vulnerability finding. *In re Barker*, 299 Kan. 158, 170, 321 P.3d 767 (2014). And while detrimental reliance is obvious in this case, every client relies on counsel to ensure their legal position. Given L.A.'s experience in business and the engagement of lawyers as demonstrated in the record, we conclude the panel's finding that L.A. was a vulnerable victim is insufficient. Accordingly, we will not take this into our considerations about discipline. See ABA, Annotated Standards for Imposing Lawyer Sanctions, at 436-37 (as to the victim's vulnerability factor, ABA notes "courts look to a variety of characteristics," including the victim's age, level of education, and sophistication).

94

*Mitigating factors*

The mitigating factors the panel found were that Hodge (1) did not have a prior disciplinary record; (2) was inexperienced in the practice of law because he "had been practicing law for only five years"; and (3) "is an active and productive member of the bar of Wichita, Kansas[,] . . . enjoys the respect of his peers[,] and generally possesses a good character and reputation." Except as previously noted that Hodge practiced for nearly five years, we hold clear and convincing evidence supports the panel's mitigating factors.

Hodge asks us additionally to consider "remorse" as a mitigation factor because he "acknowledges that he exercised poor judgment and 'should not have involved myself in this mess at all.'" He expressed a similar feeling at the hearing before this court, although his regrets were couched more as a claimed misreading of the disciplinary rules rather than an appreciation of how the evidence showed he actively preyed on CLS and L.A. to capitalize on their financial stresses and worked against their interests. This, taken with our comments regarding Hodge's refusal to acknowledge wrongdoing as an aggravating factor, causes us to reject remorse as a factor in mitigation. See *In re Hawkins*, 304 Kan. 97, 144, 373 P.3d 718 (2016) (noting "unsympathetic acknowledgment of wrongdoing" at oral arguments); *In re Williams*, 302 Kan. 990, 1001, 362 P.3d 816 (2015) (citing panel's observation that respondent "appear[ed] to be remorseful that he [wa]s presently in this situation"); *In re Hasty*, 300 Kan. 840, 850, 335 P.3d 110 (2014) ("respondent's remarks at his hearing before the court were less than convincing on his acceptance of responsibility"); see also ABA, Annotated Standards for Imposing Lawyer Sanctions, at 492-93 (stating in some states "courts have given significant weight to a lawyer's apology," and "[t]he timing of the apology can be a factor in determining the extent to which remorse will be deemed a mitigating factor").

*Conclusion: Aggravating and mitigating circumstances*

We hold the evidence supports the panel's findings of the following aggravating factors: (1) selfish motivation for the violations; (2) multiple offenses; (3) repeatedly denying giving the clients legal advice after a "wrap-up" period; and (4) denying the misconduct's wrongful nature. Further, the evidence supports the following mitigating factors found by the panel: (1) lack of a prior disciplinary record; (2) inexperience practicing law; and (3) active and productive member of the bar with the respect of his peers and a good character and reputation.

*Applicable ABA Standards*

ABA Standard 4.31 states:

"Disbarment is generally appropriate when a lawyer, without the informed consent of client(s) . . . engages in representation of a client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client, or . . . simultaneously represents clients that the lawyer knows have adverse interests with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to a client."

*Hodge's conduct merits disbarment*

As the Disciplinary Administrator correctly notes, under the ABA Standards disbarment is the presumptive sanction. Attorneys in other states have been disbarred under the ABA Standards for engaging in conflicts of interest involving business transactions with clients under similar facts. See, e.g., *People v. Barbieri*, 61 P.3d 488 (Colo. 2000); *The Florida Bar v. Doherty*, 94 So. 3d 443 (Fla. 2012); *In re Coffey's Case*, 152 N.H. 503, 880 A.2d 403 (2005).

96

We conclude disbarment is the appropriate discipline. In arriving at this conclusion, we have considered the aggravating and mitigating circumstances described above, as well as the clear and convincing evidence that supports the panel's findings, conclusions, and ultimate recommendation of disbarment.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that Rickey Edward Hodge, Jr., be and he is hereby disbarred from the practice of law in the state of Kansas, effective on the filing of this opinion, in accordance with Supreme Court Rule 203(a)(1) (2017 Kan. S. Ct. R. 234).

IT IS FURTHER ORDERED that the Clerk of the Appellate Courts strike the name of Rickey Edward Hodge, Jr., from the roll of attorneys licensed to practice law in Kansas.

IT IS FURTHER ORDERED that Hodge comply with Supreme Court Rule 218 (2017 Kan. S. Ct. R. 262).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to Hodge and that this opinion be published in the official Kansas Reports.